KILGARLIN ET AL. *v.* HILL, SECRETARY OF
STATE OF TEXAS, ET AL.

No. 235. Decided February 20, 1967.

*William E. Wright* for appellants.

*Waggoner Carr,* Attorney General of Texas, *Hawthorne Phillips,* First Assistant Attorney General, and *Mary K. Wall,* Assistant Attorney General, for appellees.

PER CURIAM.

Following judicial invalidation of the constitutional and statutory provisions governing the apportionment of the Texas State Legislature, the State Legislature reapportioned both the House and the Senate. Appel-

lants promptly challenged on various grounds the constitutionality of H. B. 195[1] which reapportioned the House of Representatives in a combination of single-member, multi-member and floterial districts. The District Court sustained all aspects of the plan except those provisions respecting the counties included in 11 floterial districts, 252 F. Supp. 404, which were found violative of the equality principles announced in *Reynolds* v. *Sims,* 377 U. S. 533. The court did, however, over appellants' objections, permit the 1966 election to proceed under H. B. 195 with a proviso to the effect that if the legislature did not adopt corrective legislation by August 1, 1967, the counties in the floterial districts would be reconstituted as multi-member districts and all the representatives assigned to those counties would be elected at large.

We affirm the District Court's action in permitting the 1966 election to proceed under H. B. 195 although constitutionally infirm in certain respects. In the particular circumstances of this case there is ample precedent for the court's action. See *Drum* v. *Seawell,* 383 U. S. 831; *Toombs* v. *Fortson,* 384 U. S. 210. We also affirm the court's judgment insofar as it held that appellants had not proved their allegations that H. B. 195 was a racial or political gerrymander violating the Fourteenth Amendment, that it unconstitutionally deprived Negroes of their franchise and that because of its utilization of single-member, multi-member and floterial districts it was an unconstitutional "crazy quilt."

In another respect, however, the District Court committed reversible error. Appellants alleged that in addition to the inequalities inherent in the floterial districts,

---

[1] Tex. Rev. Civ. Stat. Ann., Art. 195a contains House Bill 195. The Senate reapportionment of 1965, Tex. Rev. Civ. Stat. Ann., Art. 193a, is not here in issue.

H. B. 195 also infringed Fourteenth Amendment rights because in the remaining legislative districts of the State there were unacceptable variations from the principle of *Reynolds* v. *Sims* that among legislative districts the population per representative should be substantially equal. Appellants' proof showed that in these other districts the population per representative varies from 54,385 to 71,301, or from 14.84% overrepresented to 11.64% underrepresented. The ratio between the largest and the smallest district is thus 1.31 to 1. The deviation from the average population per representative is greater than 10% in 12 single-member districts, and a total of 55 representatives would be elected from eight multi-member districts in which the population per representative varies from the ideal by more than 6%.

The District Court sustained the constitutionality of H. B. 195 on two grounds. First, it held that appellants had the burden not only of demonstrating the degree of variance from the equality principle but also of "negat[ing] the existence of any state of facts which would sustain the constitutionality of the legislation." 252 F. Supp. 404, 414. This, the court held, appellants had not done. At that time, of course, *Swann* v. *Adams*, 385 U. S. 440, had not been announced. Under that case it is quite clear that unless satisfactorily justified by the court or by the evidence of record, population variances of the size and significance evident here are sufficient to invalidate an apportionment plan. Without such justification, appellants' analysis of H. B. 195 made out a sufficient case under the Fourteenth Amendment. —

Second, the District Court, not resting exclusively on its burden of proof ruling, found that the deviations from the equal population principle were amply justified here because they resulted from a bona fide attempt to conform to the state policy requiring legislative apportion-

ment plans to respect county boundaries wherever possible. We are doubtful, however, that the deviations evident here are the kind of "minor" variations which *Reynolds* v. *Sims* indicated might be justified by local policies counseling the maintenance of established political subdivisions in apportionment plans. 377 U. S. 533, 578–579. But we need not reach that constitutional question, for we are not convinced that the announced policy of the State of Texas necessitated the range of deviations between legislative districts which is evident here. In the first place, Texas policy, as elaborated by the Attorney General and concurred in by the District Court,[2]

---

[2] The Attorney General expressed the state policy in a letter to the Speaker of the House, included as Appendix "D" in the opinion below, 252 F. Supp. 404, 455–456.

May 19, 1965

Honorable Ben Barnes
Speaker of the House
Austin, Texas

Dear Mr. Speaker:

As a result of the analyzing and briefing of Section 26, Article III of the Texas Constitution of 1876 and the recent decisions of the U. S. Supreme Court on the subject of state reapportionment, this office has reached the following legal conclusions.

1. Whenever a single county has sufficient population to be entitled to more than one representative, all the representatives to which it is entitled *shall be apportioned* to that county.

2. Multi-representative counties may be apportioned so that the representatives can run at-large within the county or from individual districts within the county or, a combination of any of these methods.

3. If a single county does not have sufficient population to entitle it to one representative, such county shall be joined with one or more contiguous counties until the proper population ratio is achieved. *The above cited provision of the Texas Constitution requires that counties be kept intact and their boundaries not be violated.*

4. Should the keeping of counties intact result in a violation of the Supreme Court "one man, one vote" rule, then the county lines must be violated *but only to the extent necessary to carry out the mandate*

permits the formation of multi-member and floterial districts and even, where necessary, the violation of county lines in order to surmount undue population variations. In the second place, the District Court did not relate its declared justification to any specific inequalities among the districts, nor demonstrate why or how respect for the integrity of county lines required the particular deviations called for by H. B. 195. Nor did the District Court articulate any satisfactory grounds for rejecting at least two other plans presented to the court, which respected county lines but which produced substantially smaller deviations from the principles of *Reynolds* v. *Sims.* Similar fault can be found in accepting a general county-line justification for the population deviations that would occur should the present floterial districts be reconstituted as multi-member districts. The ratio between the largest reconstituted district and the smallest district created by H. B. 195 would be 1.21 to 1, and seven representatives would be elected from districts overrepresented by 13% or more. Another five representatives would be elected from districts overrepresented by 8% or more.

Appellants also raise specific challenges to the provisions of H. B. 195 with respect to Dallas, Bexar, and Harris Counties. Dallas and Bexar Counties are rel-

---

*of the Supreme Court.* In all other instances, county lines must remain intact and multi-county districts or flotorial districts be formed by the joining of complete and contiguous counties.

The above legal conclusions have been set out as clearly and concisely as possible. These conclusions have been reached by a thorough analysis of the Texas constitutional provisions as well as recent federal court decisions. Our research has also thoroughly developed the legislative history and legislative interpretation of the legislative sessions immediately prior to and immediately subsequent to the adoption of the constitutional provisions involved.

Yours very truly,
s/Waggoner Carr

atively densely populated multi-member districts. Measured by population alone, each county could support one more representative than is allocated to it under H. B. 195, and thus more nearly approximate the arithmetic ideal. Giving each of them one more representative would not, of course, violate their county lines; and we cannot be sure, at least on this record and in view of the 150-member limit on the House of Representatives, that Dallas and Bexar Counties must be denied additional representation in order to adhere to county lines in other districts throughout the State. If other districts cannot be re-formed within county lines in such a way as to afford Dallas and Bexar Counties another representative and at the same time to afford the re-formed districts constitutional representation, we would have to meet the question whether the state policy advanced here justifies the seeming[3] underrepresentation in Dallas and Bexar Counties, which is 6.42% and 7.59% respectively. But on the record that is now before us we do not reach this issue and believe that the District Court should give further consideration to these counties.

Appellants complain that district 24 in Harris County is assigned only six representatives whereas district 22 in the same county with a slightly smaller population is assigned seven representatives. The court found the record to establish that the population in district 22 was growing rapidly as compared with district 24 and would soon justify the extra representative. This factual de-

---

[3] Our cases do not foreclose attempts to show that in the particular circumstances of a given case multi-member districts are invidiously discriminatory. See *Burns* v. *Richardson,* 384 U. S. 73, 88–89. It has recently been suggested that multi-member districts such as Dallas and Bexar are adequately represented, if not over-represented. See Banzhaf, Multi-member Electoral Districts—Do They Violate the "One Man, One-Vote" Principle, 75 Yale L. J. 1309 (1966).

termination not being challenged here, we accept the ruling of the District Court regarding these districts.

The judgment is reversed in part and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, concurring.

While I join the opinion of the Court, I reserve decision on one aspect of the problem concerning multi-member districts.

Under the present regime each voter in the district has one vote for each office to be filled. This allows the majority to defeat the minority on all fronts. It is suggested that in multi-member districts each person be able to vote for only one legislator, the theory being that in that way a minority, either political or otherwise, would have a chance to elect at least one representative.

I am not sure in my own mind how this problem should be resolved. But in view of the fact that appellants claim that multi-member districts of Texas are constructed in such a manner that Negroes are effectively disenfranchised, I would reserve that question for consideration when the case is once again before the District Court.

Mr. Justice Clark would affirm the judgment of the District Court.

Mr. Justice Harlan and Mr. Justice Stewart would affirm the judgment of the District Court in its entirety, on the basis of the reasoning contained in Mr. Justice Harlan's dissenting opinion in *Swann* v. *Adams,* 385 U. S. 440, 447.