Newbold *v.* Osser, Appellant.

Argued April 18, 1967. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Levy Anderson,* First Deputy City Solicitor, with him *Frank J. Pfizenmayer,* Assistant City Solicitor, *Matthew W. Bullock, Jr.,* Second Deputy City Solicitor, and *Edward G. Bauer, Jr.,* City Solicitor, for City of Philadelphia, appellant.

*Marvin Comisky,* with him *Goncer M. Krestal, Martin Vigderman, Abraham E. Freedman,* and *Blank, Rudenko, Klaus & Rome,* and *Freedman, Borowsky & Lorry,* for appellants.

*J. Pennington Straus,* with him *Carter R. Buller, Tyson W. Coughlin, Howard H. Lewis, Irving Morgenroth, Eugene F. Waye* and *Edward E. Russell,* for appellees.

OPINION PER CURIAM, April 19, 1967:
Decree reversed, Opinion to follow. Each party to pay own costs.

---

OPINION BY MR. JUSTICE ROBERTS,[1] May 24, 1967:
This is an appeal by the City of Philadelphia and by ten members of the City Council of Philadelphia from a preliminary injunction entered by the Court of Common Pleas of Philadelphia County declaring in-

---

[1] Our disposition is consistent with the opinions of the Supreme Court of the United States filed May 22, 1967, *Dusch v. Davis,* 387 U.S. 112, 87 S. Ct. 1554 (1967); *Sailors v. Board of Educ.,* 387 U.S. 105, 87 S. Ct. 1549 (1967); *Moody v. Flowers,* 387 U.S. 97, 87 S. Ct. 1544 (1967).

480

valid under the Constitutions of the United States and of Pennsylvania and under the Philadelphia Home Rule Charter an ordinance of city council apportioning the city into ten councilmanic districts. In addition to declaring the ordinance invalid, the court below directed that, pending enactment by city council of substitute constitutionally valid legislation, all district councilmen should be nominated and elected from the City of Philadelphia at large.

Section 2-101 of the Philadelphia Home Rule Charter provides that Philadelphia's city council shall consist of seven members elected at large and ten members each of whom shall be elected from one of ten districts into which the city is divided. Section 2-102 of the charter requires city council within six months of the publication of the decennial census to redistrict the city into councilmanic districts each of which "shall consist of a ward or contiguous wards containing as nearly as possible the population factor obtained by dividing the City's population at the preceding decennial census by ten." On December 21, 1961 an ordinance was adopted pursuant to §2-102 of the charter. Thereafter, on August 2, 1965, the Court of Quarter Sessions of Philadelphia County directed that the wards of the city should be realigned. As a result changes in ward boundaries, ward designations and an increase in the number of wards from 60 to 66 were brought about.

On July 18, 1966 the city solicitor by formal opinion advised the mayor that because of the ward realignment it was the duty of city council to redistrict the city and that the redistricting should be completed in sufficient time to permit the organization of election machinery to hold the primary elections of May, 1967. At this primary election, district councilmen were to be nominated to run as candidates at the November, 1967 municipal election for four-year terms

commencing the first Monday of January, 1968. In the late summer of 1966, a proposed redistricting ordinance was introduced into city council and in late September public hearings held thereon. Plaintiff Newbold, then and now an officer of the Committee of Seventy and a plaintiff in this proceeding appeared along with Edward E. Russell at the public hearings on the proposed ordinance before the rules committee of council. Messrs. Newbold and Russell submitted an alternative plan for redistricting which they contended was superior to that contained in the bill introduced because of the greater preservation of neighborhoods and of homogeneity in the districts. On the other hand, both Mr. Newbold and Mr. Russell conceded at the hearing that the ordinance introduced into council was unobjectionable in terms of the deviations from precise mathematical equality of population.[2]

On October 27, 1966, the bill originally introduced into council was adopted without the alterations urged by plaintiff Newbold. On January 26, 1967, plaintiff Newbold and three others filed a complaint in equity against the city commissioners, city council, mayor, finance director, treasurer, commissioner of procurement and city controller of Philadelphia and against the city

---

[2] Mr. Newbold said: "[W]e find some features of Bill 2086 [the redistricting ordinance introduced into City Council] which are highly desirable. For example, according to recent Pennsylvania and United States Supreme Court decisions, the overriding consideration in any redistricting or reapportionment is population. That is, legislative districts must be as nearly as equal in population as may be in order to meet the test of constitutional validity. The present bill appears to pass that test with flying colors." Mr. Russell said: "We certainly won't quarrel with the population of your proposed districts because as has been said previously, and as Mr. Newbold and I agree, in terms of the population requirements established by the Pennsylvania and United States Supreme Courts, you are in line, and I don't think there is any question about that."

itself. The complaint alleged that the redistricting ordinance was unconstitutional because (1) it failed to meet the legal requirement that the ten districts be as nearly equal in population as possible; (2) it discriminated against nonwhite citizens;[3] (3) it was prepared in secret, without public notice and without the consultation of minority (i.e., Republican) members of city council;[4] (4) it was motivated by illegal, improper and unconstitutional partisan political factors; (5) it established district boundaries which were neither compact, nor consistent with traditional, historical, geographical, physical or neighborhood boundaries. The complaint, inter alia, prayed for a preliminary injunction restraining the holding of a primary election under the redistricting ordinance and for a permanent injunction thereafter.

Preliminary objections to plaintiffs' complaint were filed by the city on February 9, 1967. Hearings were then held by the court below on February 20, 21, 22, 24 and 27 at which time testimony and exhibits filling over 800 pages of record as well as briefs and oral arguments were presented. On March 2, 1967 the court below overruled the defendants' preliminary objections. On March 15 the court below filed an opinion granting the application for a preliminary injunction. The court directed that the redistricting should not be carried

---

[3] The court below found that this allegation was not supported by evidence and that finding has neither been appealed nor contested before us. We thus do not consider it relevant to our disposition of this appeal.

[4] It should be noted that plaintiffs do not contend and did not apparently contend before the court below that this allegation, if true, would invalidate the ordinance qua municipal legislation as distinct from its affecting the ordinance's validity because the ordinance deals with redistricting. Rather we understand the allegation merely to be submitted in support of plaintiff's claim that the redistricting ordinance is invalid because motivated by improper partisan political factors.

into effect and that, pending enactment by city council of substitute legislation, and commencing with the municipal primary election of May 16, 1967, all district councilmen should be nominated and elected from the city at large and that all candidates who had filed and not withdrawn for such office should be placed in a category entitled "District Councilman-at-large" for their respective political party.

Prior to the entry of the decree on March 15, 1967, the following deadlines had been met in preparation for the municipal primary election of May 16, 1967 pursuant to the provisions of the Election Code of June 3, 1937, P. L. 1333, as amended, 25 P.S. §2600 et seq. (Supp. 1967) on the basis of the districts created in the ordinance of October 27, 1966: (1) By February 14, 1967 municipal clerks and party chairmen had sent to the County Board of Elections written notice setting forth all municipal offices to be filled at the primary election. Election Code §904, as amended, 25 P.S. §2864 (Supp. 1967). (2) By February 28, 1967 the County Board of Elections had published in newspapers the names of all offices for which nominations were to be made at the primary election. Election Code §906, as amended, 25 P.S. §2866 (Supp. 1967). (3) By March 7, 1967 all nominating petitions that could be timely filed had been filed. Election Code §913, as amended, 25 P.S. §2873 (Supp. 1967). (4) By March 14, 1967 all withdrawals of and objections to nominating petitions had been made. Election Code §§914, 977, as amended, 25 P.S. §§2874, 2937.

On the same day that the decree was entered, the city took an appeal to this Court. On March 20, 1967, ten defendant councilmen retained private counsel and filed a separate appeal to this Court. Thereafter on March 21 this Court granted a supersedeas as to the effect of the preliminary injunction and on March 29 we consolidated the two appeals, set them down for

argument on April 18, 1967 and ordered a stay of all proceedings in the court below. In the time between our order of March 29 and the argument of this case on April 18 certain additional steps pursuant to the code in preparation for the municipal primary elections were taken by the County Board of Elections on the basis of the redistricting ordinance.

After hearing argument on April 18, this Court, be cause of the public importance of a prompt disposition of this appeal, entered a per curiam order on April 19. In that order we reversed the decree below and noted that an opinion was to follow. This is that opinion.

Our reversal of the preliminary injunction and decree in the court below was based on two grounds. First, it was our view that the court below abused its discretion when it aborted an electoral process already set in motion on the date of its decree. Second, in view of the rejection of plaintiffs' contention that the redistricting discriminates invidiously against nonwhite voters, we believe the court had no basis for declaring the redistricting ordinance invalid.

An examination of the many reapportionment and redistricting cases decided since *Baker v. Carr,* 369 U.S. 186, 82 S. Ct. 691 (1962) reveals that courts have uniformly approached the granting of relief in this area with the greatest caution and an effort to minimize judicial interference with legislative prerogatives.[5] Illustrative of this attitude is the fact that there appear to be no reported cases in which a court required legislators to run at large or under a judicially created apportionment plan following the preliminary determination of the invalidity of a legislatively drawn redistricting scheme. In other words, unlike the court

---

[5] See, e.g., the litigations culminating in *Kilgarlin v. Hill,* 386 U.S. 120, 87 S. Ct. 820 (1967) ; *Toombs v. Fortson,* 384 U.S. 210, 86 S. Ct. 1464 (1966) (per curiam) ; *Roman v. Sincock,* 377 U.S. 695, 84 S. Ct. 1449 (1964).

below, every court which has invalidated a legislative apportionment plan has given the Legislature at least one opportunity to revise its plan, even where the imminence of an election meant that that election would have to be held on the basis of an invalid plan.[6] The vital importance of the considerations which underlie this practice were detailed by this Court, quoting from three opinions of the Supreme Court of the United States, in *Butcher v. Bloom,* 415 Pa. 438, 458-61, 203 A. 2d 556, 567-69 (1964).[7]

The decisions of this Court, as well as other courts which have considered the problem, have also made clear that the avoidance of disruption of the electoral process is a factor of great importance in the determination by a court of equity as to the timing of relief from invalid apportionment.[8] Significantly, neither the research of the parties, nor our own, has discovered a single reported case in which a court ordered a change in an election process which, as the instant one, was so far under way at the time relief was granted. Thus we believe the court below clearly abused its discretion by ordering an election of all councilmen at large pending substitute legislation by City Council when the provisions of the Election Code made it clear that no such subsequent legislation could in fact be utilized as the basis for the forthcoming municipal and primary elections. We believe that the court below was completely unwarranted in its view that an election at large would

---

[6] See, e.g., cases cited note 5 supra.

[7] In *Scranton v. Drew,* 379 U.S. 40, 85 S. Ct. 207 (1964) (per curiam) the Supreme Court of the United States implicitly approved the approach taken by this Court in the first *Butcher* opinion.

[8] *Butcher v. Bloom,* 415 Pa. 438, 459, 203 A. 2d 556, 568 (1964); see *Ambridge Borough Electors Petition,* 425 Pa. 203, 228 A. 2d 774 (1967) (per curiam); *Armentrout v. Schooler,* 409 S.W. 2d 138 (Mo. 1966); *Drum v. Seawell,* 250 F. Supp. 922 (M.D.N.C. 1966).

486

cause less harm than permitting the elections to proceed on an allegedly invalid basis. For the complete deprivation of any regional representation of the voters of Philadelphia was clearly more harmful than any, but the most excessive malapportionment. Not even the court below, we believe, concluded that the malapportionment alleged in this case was of the excessive variety which, in our view, could be the only possible justification for such a drastic remedy.

The conclusion of the court below that the redistricting ordinance was invalid rested primarily on its judgment that the deviations of that plan from precise mathematical equality of population, especially in comparison with the alternative plan presented to city council by plaintiff Newbold, did not conform to the test laid down in §2-102 of the Philadelphia Home Rule Charter or to the tests required by the guarantees of U.S. Const. amend. XIV and Pa. Const. Art. I, §5. In the districts created by city council's ordinance the average deviation from the ideal is only 4.08% varying from +7.8% for the most populous district to −6.9% for the least populous district, thus creating a ratio between the most and least populated districts of 1.15 to 1. By contrast, in the districts created by the plan proposed by plaintiff Newbold the average deviation from the ideal is 3.53% varying from a +7.8% for the most populous district to a −4.7% for the least populous district and thus creating a ratio between the most and least populated districts of approximately 1.13 to 1. In considering these deviations against state and federal equality guarantees, it must be borne in mind that any dilution of voting power which they appear to represent is substantially reduced by the fact that any potential majority of city council may be composed of those seven of the seventeen councilmen whose

election at large preserves precise equality of voting power as to them.[9]

This being so, we are convinced that the ordinance redistricting City Council does not deviate enough from the substantial equality of population tests laid down in this state's or federal reapportionment decisions to require that inquiry into compactness, preservation of historical or physical boundaries, or gerrymandering which inquiry is proper when the population deviation is substantial. Our conviction in this regard is supported by the fact that there appear to be no reported cases in which ratios as small as those here have been successfully challenged. Indeed the ratios of the districts created by this Court's reapportionment of the General Assembly, *Butcher v. Bloom*, 420 Pa. 305, 216 A. 2d 457 (1966), were in excess of those involved here as were the ratios in the plan approved by the Supreme Court of the United States in *Crawford County Bar Ass'n v. Faubus*, 383 U.S. 271, 86 S. Ct. 933 (1966), affirming per curiam *Yancey v. Faubus*, 251 F. Supp. 998 (E.D. Ark. 1965) (per curiam), to name only one such case, although it is true that in the *Faubus* case the deviation of 1.3 to 1 caused the district court to make an inquiry into factors such as the preservation of political subdivision boundaries.

Appellees have also sought to argue on appeal that the "as nearly as possible" language of the §2-102 of the Philadelphia Home Rule Charter imposes a standard of equality of population of districts stricter than that imposed by the equality guarantees of the state and federal constitutions. However that may be, there are two short answers to plaintiffs' contentions. The first is that when this Court redistricted the Pennsylvania Senate it did so in accordance with Pa. Const. Art. II, §16 which provides that senatorial districts

---

[9] See *Dusch v. Davies*, 387 U.S. 112, 87 S. Ct. 1554 (1967).

shall be "as nearly equal in population as may be.". That language is no different in effect from the "as nearly as possible" language in §2-102 of the Philadelphia Home Rule Charter. Yet the deviations in population in the Court's senatorial districts were greater than those in the redistricting ordinance involved here. Hence it must be apparent that this Court views such a deviation as not violative of the equality standard so phrased. The second answer to the plaintiffs' argument on the basis of the §2-102 of the charter is that neither they nor the court below have suggested a plan which is significantly closer in equality of population than the redistricting ordinance. Thus in light of the importance of permitting reapportionment by the Legislature wherever possible, we certainly do not think that the "as nearly as possible" language of the charter is to be read to permit judicial interference merely because an alternative plan is proposed whose average variation from the ideal is one half of one percent less than the Legislature's plan and whose maximum ratio is only 2% closer to mathematical perfection than the Legislature's plan. So to hold would invite a multiplicity of attacks on redistricting legislation by disgruntled factions based on what amounts to de minimis approaches to mathematical equality.

Besides believing city council's plan to be invalid because of its departure from substantial equality of population of districts, the court below also concluded that evidence of gerrymandering required its finding that the redistricting ordinance was invalid. Although the court below apparently recognized that gerrymandering per se does not, as far as is known, raise any cognizable federal constitutional claim against reapportionment legislation, *WMCA v. Lomenzo*, 238 F. Supp. 916, 925-26 (S.D. N.Y.), aff'd per curiam, 382 U.S. 4, 86 S. Ct. 24 (1965), it concluded on the basis of *Butcher v. Bloom*, 415 Pa. at 463 that gerrymander-

ing per se does raise a cognizable state constitutional claim. This is indeed a puzzling conclusion in light of the fact that the only reference to gerrymandering on page 463 of our opinion in the first *Butcher* case appears in a lengthy quotation from the Supreme Court of the United States' opinion in *Reynolds v. Sims,* 377 U.S. 533, 578-79, 84 S. Ct. 1362, 1390 (1964). Moreover, an examination of that quotation makes it clear that the Supreme Court of the United States was speaking only of gerrymandering in the context of a situation where substantial equality of population among districts was not present. Thus, there is no basis on page 463 of our first *Butcher* opinion, nor is there any other basis in Pennsylvania's present Constitution or laws for the proposition that gerrymandering per se, as distinct from departure from explicit constitutional or statutory requirements of compactness or contiguity, may constitute the sole basis upon which a legislative plan of apportionment may be judicially invalidated.

Thus we restate here our order of April 19, 1967 that the decree below is reversed and each party is to pay his own costs.