MEMBERS OF JOINT COMMITTEE ON LEGISLATIVE ORGANIZATION
You request my opinion on a number of questions relating to the apportionment of the Wisconsin Legislature under the various provisions of our State Constitution, principally secs. 1 through 5 of Art. IV thereof, and as required under the Federal Constitution.
Sections 1 through 5, Wis. Const., provides in part, as follows:
"Legislative power. SECTION 1. The legislative power shall be vested in a senate and assembly.
"Legislative power. SECTION 1. The legislative power of the members of the assembly shall never be less than fifty-four nor more than one hundred. The senate shall consist of a number not more than one-third nor less than one-fourth of the number of the members of the assembly . . .
"Apportionment. SECTION 3. * * * At their first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew *Page 102 
the members of the senate and assembly, according to the number ofinhabitants, * * *. (Emphasis added)
"Assemblymen, how chosen. SECTION 4. * * * The members of the assembly shall be chosen biennially, by single districts, on the Tuesday succeeding the first Monday of November after the adoption of this amendment, by the qualified electors of the several districts, suchdistricts to be bounded by county, precinct, town or ward lines, toconsist of contiguous territory and be in as compact form as practicable. * * * (Emphasis added)
"Senators, how chosen. SECTION 5. * * * The senators shall be elected by single districts of convenient contiguous territory, at the same time and in the same manner as members of the assembly are required to be chosen; and no assembly district shall be divided in the formation of asenate district. * * *" (Emphasis added)
You indicate that the Joint Committee on Legislative Organization feels that several recent Federal reapportionment decisions, rendered since the last definitive pronouncement on the subject by the Wisconsin Supreme Court (State ex rel. Reynolds v. Zimmerman (May 14, 1964), 23 Wis.2d 606,128 N.W.2d 16, 128 N.W.2d 349), suggest the need for more current judicial guidance by way of a declaratory judgment action on certain constitutional questions affecting the forthcoming legislative reapportionment. Your committee therefore inquires:
(a) whether such relief should be sought in Federal District Court or in the Wisconsin Supreme Court;
(b) what "controversy" should be established;
(c) who should constitute the "parties" under statutes relating to submission of an agreed case (sec. 269.01, Wis. Stats., or similar U.S. Code provisions)?
As you point out, a significant number of relevant Federal decisions have been rendered since Reynolds v. Zimmerman, supra, and the landmark Federal decision which was before the court at that time, i.e., Baker v.Carr (1961), 269 U.S. 186, 82 S.Ct. 691, 7 L.ed 2d 663. These more recent decisions *Page 103 
include Reynolds v. Sims (1964), 377 U.S. 533, 84 S.Ct. 1362,12 L.ed. 2d 506. Swann v. Adams (1967), 385 U.S. 440, 87 S.Ct. 569,17 L.ed. 2d 501; Kilgarlin v. Hill (1967), 386 U.S. 120, 87 S.Ct. 820,17 L.ed. 2d 771; Kirkpatrick v. Preisler (1969), 394 U.S. 526,89 S.Ct. 1225, 22 L.ed. 2d 519, reh. den., 395 U.S. 917, 89 S.Ct. 1737,23 L.ed. 2d 231; Wells v. Rockefeller (1969), 394 U.S. 542, 89 S.Ct. 1234,22 L.ed. 2d 535; Hadley v. Junior College District of Metropolitan KansasCity, Missouri, et al. (1970). 397 U.S. 50, 90 S.Ct. 791, 25 L.ed. 2d 45.
Through these decisions of the United States Supreme Court, a case-by-case refinement of the equal protection clause of the Fourteenth
Amendment to the United States Constitution has developed which has resulted in a doctrine of constitutional law, which commands that whenever a state or local government decides to select persons by popular election to perform governmental functions, each qualified voter must be given a vote which is equally weighted, insofar as is practicable, with votes cast by all other electors. See Hadley case, supra.
Your inquiry is no doubt further generated in part by statements appealing in the prior opinion of our office, reported in 56 OAG 105 (1967), which indicated that Senate Bill No. 1, 1967, would result in an apportionment plan for legislative districts which would be unconstitutional. In the course of discussing the various reapportionment authorities reported at that time, particularly Reynolds v. Sims, supra, we there advised, at p. 108:
"These constitutional requirements [Art. IV, secs. 4 and 5, Wis. Const.], as previously interpreted by the Wisconsin court, make the task of achieving equality between assembly and senatorial districts a difficult one.
"It is possible that the Wisconsin court might now hold that, in light of Reynolds v. Sims, these provisions must give way to the United States constitutional requirements of one man-one vote if a plan embodying them does not result in substantial equality among assembly and senatorial districts." *Page 104 
And at page 111:
"In Swann v. Adams, it was stated that what is marginally permissible in one state may be unsatisfactory in another depending on the particular circumstances of the case. The rule against splitting counties for attachment established in 1892 in Cunningham [The State ex rel. AttorneyGeneral v. Cunningham (1892), 81 Wis. 440, 522, 528, 51 N.W. 724], and followed in 1964 by Reynolds v. Zimmerman, before Reynolds v. Sims, was based on constitutional interpretation rather than express constitutional provision. This might make the rule even more difficult to sustain if substantial deviations result therefrom.
"It is, therefore, questionable whether the reapportionment plan adopted by the Wisconsin supreme court in Reynolds v. Zimmerman would be constitutional under the rules later established by the United States supreme court in Reynolds v. Sims. Bill No. 1, S., would establish districts with significantly greater deviations than those in the plan adopted by the Wisconsin supreme court. I am of the opinion, therefore, that an apportionment act resulting from enactment of Bill No. 1, S., 1967, would be unconstitutional."
Your first questions appear to proceed from an assumption that a declaratory judgment action would be appropriate at this time and would provide the legislature with additional guidance as to the manner in which it is to proceed to reapportion our state. In my judgment, however such a supposition is clearly without foundation. Consideration of any such action at this time is, at best, most premature.
As you suggest, in order to properly approach a court in the very first instance, some "controversy" between proper parties must exist. Courts will not normally indulge in the rendition of purely advisory opinions. However, no controversy can be said to exist and a court cannot properly deal with the more specific questions of constitutionality unless or until a law has been duly enacted and some person has been deprived of his constitutional rights by its operation. Goodland v. Zimmerman
(1943), 243 Wis. 459, 10 N.W.2d 180. Therefore, before any court is in a position to determine *Page 105 
whether a reapportionment plan is valid, the plan must be enacted as a law through the joint action of the legislature and the Governor. Since the 1971 Legislature has convened, no reapportionment law has been enacted for use in electing state senators and representatives at the forthcoming general election. Under such circumstances, the legal action you suggest would simply delay the timely legislative action demanded by our Wisconsin constitution and would create an aura of procrastination reminiscent of the abortive reapportionment efforts of the 1960's.
While more recent state reapportionment experiences suggest that an eleventh hour crisis could again arise which would generate and justify legal action to preclude a denial of state and federal constitutional rights brought about by a failure of the legislature and Governor to provide for a valid reapportionment, such drastic action could only be justified where it appeared the legislature and Governor would be unable to enact a timely apportionment. Barring such a catastrophy, however, court action such as you presently suggest would have to abide the enactment of a reapportionment law representative of the best efforts of the two coordinate branches of state government which the constitution holds initially responsible. Then, and only then, could any person judge intelligently whether any legal action appeared necessary to preserve constitutional rights, who would constitute proper parties or what forum should be chosen.
You next inquire whether a legislative apportionment should observe county lines as far as possible, consistent with the primary requirement of achieving population equality among districts.
This question was previously answered in the affirmative by this office in 58 OAG 88 (1969). In that opinion, at page 91, the following is stated:
". . . In my opinion the Wisconsin Constitution no longer may be considered as prohibiting assembly districts from crossing county lines, in view of the emphasis the United States Supreme Court has placed upon population equality among electoral districts. Nevertheless, apportionment of *Page 106 
assembly seats should be done in accordance with both federal and Wisconsin constitutions, if possible. In other words, the county line requirement of Cunningham [State ex rel. Atty. Gen. v. Cunningham
(1892). 81 Wis. 440, 51 N.W. 724] should be followed insofar as it does not compel disregard for the requirements of the federal equal protection clause."
Your third question asks whether a legislature apportionment should observe precinct lines as far as possible, consistent with the primary requirement of achieving population equality among districts, and, if so, whether the population of precincts may be estimated.
In the Cunningham case, supra, our Supreme Court indicated that the term "precinct" as used in Art. IV, sec. 4, Wis. Const., requiring assembly districts to be "bounded by county, precinct, town or ward lines," had ceased to have significance since precincts as politicaldivisions had ceased to exist. 81 Wis. 440, 514, 520. In so concluding, it was pointed out that the precincts in existence in some counties at the time the constitution was adopted in 1848, "corresponded in some respects to the town or ward of other counties" but that when the uniform system of town and county government (Art. IV, sec. 23) became fully operative no civil subdivisions which were the equivalent of the precinct of territorial times remained other than towns and wards.
It is my opinion that a court would hold that insofar as may be consistent with population equality, town and ward lines should be followed and that municipal precinct lines may be disregarded.
In response to your question as to whether the population of precincts may be estimated, it is my opinion that the quality and detail of the current census appears to have eliminated any need for estimates of populations.
You next request my opinion whether a legislative apportionment should observe village lines as far as possible in districting since, as you point out, the word "village" is absent from the list of boundaries which Art. IV, sec. 4, *Page 107 
Wis. Const., indicates should be followed the formation of assembly districts.
In my opinion, village lines may be utilized in the formation of assembly districts. Such a conclusion is justified for a number of reasons.
At the time of the adoption of the Wisconsin Constitution in 1848, a firm concept of the nature of an incorporated village was yet to be realized. Because of a lack of sophistication and consistency, the incorporated village of this period was sometimes structured more like a city than the village we now know and at times was still considered a part of the town for certain governmental purposes.
A number of early villages incorporated by special act, both before and after the adoption of the constitution, were divided into wards or districts for general governmental purposes such as collecting and expending taxes and the conduct of elections. These wards also formed basic political or civil subdivisions, which sometimes had their own governmental framework, and from which representatives to the village government would be chosen. Prior to the adoption of the constitution, the term "village" could also apparently be used more loosely to identify at least some of the communities which had organized under more general laws, such as No. 17 of the 1836 Laws of the Legislative Assembly of the Wisconsin territory, designated "AN ACT to incorporate the inhabitants of such towns as wish to be incorporated." This act authorized "residents of any town or village of any number of dwellings situated contiguous and convenient for such purpose" and containing 300 persons to become incorporated "for the better regulation of their internal police." These incorporations were to be known "by the name and style of the president and trustees of the town of ___________." Later on in territorial days, other villages were incorporated, by special act, with much the same governmental structure, i.e., a president and trustees elected at large. Finally, to add to the confusion, some communities appear to have been referred to as villages when they had not been incorporated as such. *Page 108 
The early importance of town government as a basic governmental unit is demonstrated by the fact that when the village of Milwaukee incorporated as a city in 1846 each of its wards were designated as "a separate township or town under the laws regulating town and county government" and the three aldermen of each ward were ex-officio supervisors of such towns. Also, some of the early Wisconsin villages incorporated by special acts were joined to towns for state or county elections by virtue of such acts. Jones v. Kolb (1882), 56 Wis. 263, 267, 14 N.W. 177. Likewise, villages organized under such general laws as ch. 70, R.S. 1858, retained the right to vote at town elections.
There were numerous other examples of organizational interrelationships between villages and towns. For example, in the earlier days of statehood towns retained varying degrees of authority to levy taxes upon village property and from time to time certain town officers, such as the town treasurer, assessor or marshal, performed functions which would ordinarily be performed today by village officers. In the Jones case,supra, however, the court found that villages organized under ch. 40, R.S. 1878, were "separate and distinct municipal corporations, as much so as the town from whose territory the village is formed. . . ." 56 Wis. 268. Interestingly, in support of this conclusion the court pointed to an earlier act governing the incorporation of villages, ch. 188, Laws of 1872, as being a law ". . . intended to separate the village from the town for the purpose of elections." 56 Wis. 269.
This decision was followed by Cole v. The President and Trustees of theVillage of Black River Falls (1883), 57 Wis. 110, 14 N.W. 906, which held that the legislature had no power to give a voice in the election of village officers to electors outside of the village. While these conclusions hardly come as much of a revelation today, these cases demonstrate the evolution which was necessary before the village finally came to be fully recognized as a separate and independent civil and political subdivision clearly distinguishable from the town in which it was located. *Page 109 
The variety of different village powers and forms of government eventually suggested the need for uniformity. This was largely accomplished by implementation of subdiv. 9 of sec. 31 and sec. 32, Art. IV (added to the Wisconsin Constitution in 1871), which prohibited the enactment of any special or private law for incorporating any village or to amend the charter thereof and provided for future legislative modification by general law, and by implementation of the home rule amendment, Art. X, sec. 3, of 1921.
Today, when a new village is created by incorporation or an existing village is enlarged through annexation of town lands, the town's corporate authority ceases with respect to such lands falling within the new boundaries. As a consequence of this new or altered corporate relationship, some or all of the boundaries of the village become new town boundaries. Likewise, the village of today possesses many more of the same basic characteristics of the first "wards" than do present day city wards. And, of course, but for the voluntary choice of past legislatures to constitute village government as they have, villages could establish wards in the same manner as cities. See Cole case, supra, and also State ex rel. Witkowski v. Gora (1928), 195 Wis. 515,218 N.W. 837.
In addition, it is of some significance that the current court made apportionment includes an example of the use of village lines in the creation of districts, i.e., the Village of Fox Point in Assembly District Milwaukee 25 shares a common boundary with the Villages of Bayside and River Hills in Assembly District Milwaukee 18.
On the basis of the foregoing, I am convinced that if any question previously existed as to the propriety of using village lines in legislative reapportionment, such a prohibition probably no longer exists. In my opinion, an incorporated village is a "political," "civil" and "municipal" division of our state in the same sense as the terms "town" and "ward" are used in Art. IV, sec. 4, Wis. Const.
You last inquire whether the present composition of the legislature, with a 100-member assembly and a 33-member senate, can be retained in view of equal protection guarantees *Page 110 
of Art. I, sec. 1, Wis. Const., and the Fourteenth Amendment, U.S. Const., and the more specific requirements of Art. IV, secs. 2 and 5, Wis. Const.
In my opinion it is doubtful that the present composition of the legislature, with a 100-member assembly and a 33-member senate, can continue in light of the more recent emphasis placed on equality of voting power under both the State and Federal Constitutions.
However important it may seem to maintain the present number of representatives to the assembly at the maximum allowed by the Wisconsin Constitution, it now appears evident there is nothing so imperative in that figure, or the number of senators allowed, which will withstand the requirement of equality of representation by population.
I do not suggest that the equal protection principles most recently enunciated by the United States Supreme Court in its apportionment decisions deny vitality to the other apportionment principles set forth in our state constitution. However, I do suggest that future legislatures should appreciate the shift in emphasis and priority which these cases reflect. As stated in the Hadley case, supra, 90 S.Ct. 791. at p. 796:
". . . We have said before that mathematical exactitude is not required, Wesberry, supra, 376 U.S. at 18, 84 S.Ct. at 535, Reynolds,supra, 377 U.S. at 577, 84 S.Ct. at 1389; but a plan that does not automatically discriminate in favor of certain districts is.
"In holding that the guarantee of equal voting strength for each voter applies in all elections of governmental officials, we do not feel that the States will be inhibited in finding ways to insure that legitimate political goals of representation are achieved. . . ."
Our Wisconsin Supreme Court pointed out in the Cunningham case, supra, p. 531, that under our constitution there is no proper basis for the formation of senate districts until the assembly districts have been properly apportioned and formed. Therefore, if the assembly districts *Page 111 
are apportioned in such a manner as will, in the words of the Hadley
case, supra, "insure, as far as practicable, that equal numbers of voters can vote for proportionally equal numbers of officials," it is difficult to accept the possibility of maintaining 100 seats in the assembly and 33 seats in the senate at the same time. Since the legislature must be as faithful to equal protection principles in the apportionment of senate districts as well as in the apportionment of assembly districts, and inasmuch as Art. IV, sec. 5, of our constitution prohibits the division of an assembly district in the formation of a senate district, it is doubtful that the required measure of equality of voting power could be achieved unless each senate district contained the same number of assembly districts.
RWW:JCM