RICHARD C. KELLY, District Attorney, Juneau County
You request my opinion concerning what duty sec. 59.03
(2) (c), Stats., places on county boards in the State of Wisconsin to reapportion by January 1, 1972. Your question is prompted by the fact that January 1, 1972, is the earliest date candidates may circulate nomination papers for the office of county supervisor to be filled at the Spring 1972 election. Section 8.10 (2), Stats.
Section 59.03 (2) (c), Stats., provides as follows:
"(c) Apportioning supervisory districts. Following each *Page 398 
federal decennial census the secretary of state shall certify to each county board chairman the population of each town, village and city in the county. As soon aspracticable but not more than one year after receivingthe population certification, the county board in eachcounty shall apportion county supervisory districts asprovided in par. (b) and the chairman of the county board shall file a certified copy of the apportionment plan with the secretary of state." (Emphasis added)
Section 59.03 (2) (b), Stats., provides as follows:
"(b) Creation of supervisory districts. The countyboard in each county shall establish and numbersupervisory districts, after a public hearing, in such amanner that each supervisor shall represent as nearly aspracticable an equal number of persons, but considering such other factors as continuity of interest, compactness and contiguity of existing town, village and city lines. More than one municipality may be placed in any supervisory district and more than one district may be formed within a municipality. Whenever conditions arise where creation of a supervisory district based primarily on population cannot be achieved without violating municipal boundary lines, but where a combination of 2 or more municipalities could be established creating a supervisory district of approximately double the population average of the other supervisory districts, the county board may create such a supervisory district and designate that 2 supervisors be elected from such a district." (Emphasis added)
It is my opinion that all counties subject to the provisions of sec. 59.03 (2) (c), Stats., have a duty to apportion their supervisory districts in accordance with the 1970 Federal decennial census so as to insure that all county supervisors in all such counties will be elected from such newly apportioned districts on the first Tuesday in April, 1972. Since the earliest date candidates may circulate nomination papers for county supervisor is presently designated by statute as January 1, 1972, apportionment should be accomplished by that date. *Page 399 
My response to your question is based primarily on constitutional considerations under the terms of both our Wisconsin Constitution and the U.S. Constitution. Under the Fourteenth Amendment to the Federal Constitution, legislative bodies must apportion in atimely fashion if given adequate opportunity to do so.Reynolds v. Sims (1964), 377 U.S. 533, 586, 84 S.Ct. 1362,1394, 12 L.ed. 2d 506. The same constitutional requirement is imposed under Art. I, sec. 1, Wis. Const. State ex rel. Sonneborn v. Sylvester (1965),26 Wis.2d 43, 132 N.W.2d 249. Therefore, the duty imposed on all Wisconsin counties, under both Federal and State Constitutions, to apportion in a timely fashion, i.e., "as soon as practicable," following the 1970 Federal decennial census, would have existed even had such requirement not also been incorporated in sec.59.03 (2) (c), Stats. Furthermore, in emphasizing the constitutional basis for my opinion, I do not wish to suggest that such conclusion is not also in accord with the intention of the legislature which enacted sec. 59.03
(2) (c), as part of ch. 20, Laws of 1965. Although that legislature had no knowledge either of the numerous apportionment cases which were to follow or the specific manner in which the 1970 census data would be made available, its obvious intent was to implement the constitutional mandate to insure meaningful equal representation through timely apportionments at the county level of government.
The following are among the various more recent apportionment decisions of the United States Supreme Court rendered subsequent to the enactment of sec. 59.03
(2) (c), Stats., yet affecting apportionment at the county as well as other levels of government: Burns v.Richardson (1966), 384 U.S. 73, 86 S.Ct. 1286,16 L.ed. 2d 376; Swann v. Adams (1967), 385 U.S. 440,87 S.Ct. 569, 17 L.ed. 2d 501; Kilgarlin v. Hill (1967),386 U.S. 120, 87 S.Ct. 820, 17 L.ed. 2d 771; Dusch v.Davis (1967), 387 U.S. 112, 87 S.Ct. 1554, 18 L.ed. 2d 656;Kirk v. Gong (1968), 389 U.S. 574, 88 S.Ct. 695,19 L.ed. 2d 784; Avery v. Midland County (1968),390 U.S. 474, 88 S.Ct. 1114, 20 L.ed. 2d 45; Kirkpatrickv. Preisler (1969), 394 U.S. 526, 89 S.Ct. 1225,22 L.ed. 2d 519; Wells v. Rockefeller (1969), 394 U.S. 542,89 S.Ct. 1234, 22 L.ed. 2d 535; Hadley v. Junior CollegeDist. of Metro. Kansas City, Mo., *Page 400 et al. (1970), 397 U.S. 50, 90 S.Ct. 791, 25 L.ed. 2d 45;Abate v. Mundt (1971), 403 U.S. 182, 91 S.Ct. 1904,29 L.ed. 2d 399; Whitcomb v. Chavis (1971), 403 U.S. 124,91 S.Ct. 1858, 29 L.ed. 2d 563; Ely v. Klahr (1971),403 U.S. 108, 91 S.Ct. 1803, 29 L.ed. 2d 552.
The last three of the foregoing decisions were rendered June 7, 1971, and one, Ely v. Klahr, provides some insight as to what the court will accept as a reasonable time for a legislature to reapportion based on the 1970 census. In this case, a three-judge district court for the district of Arizona had provided in its decree as follows:
"The court, having been advised that detailed population figures for the State of Arizona will be available from the official 1970 census by the summer of 1971, assumes that the Arizona Legislature will by November 1, 1971, enact a valid plan of reapportionment for both houses of the Arizona Legislature and a valid plan of redistricting the congressional districts of Arizona. Upon failure of the Legislature so to do, any party to this action may apply to the court for appropriate relief." Klahr v. Williams (D.C., Ariz., 1970), 313 F. Supp. 148, 154.
Addressing this language, the U.S. Supreme Court said:
". . . but as we have often noted, districting and apportionment are legislative tasks in the first instance, and the court did not err in giving the legislature a reasonable time to act based on the 1970 census figures which the court thought would be available in the summer of 1971. We agree with plaintiffthat the District Court should make very sure that the1972 elections are held under a constitutionallyadequate apportionment plan . . . ." 91 S.Ct. 1807
(Emphasis added)
Skolnick v. Illinois State Electoral Board (D.C., Ill., 1969), 307 F. Supp. 698, is another instance of the Federal courts indicating that legislative bodies are expected to commence apportionment at the first opportunity after the 1970 census and complete the task expeditiously. In this case, the court held a previous court promulgated congressional apportionment plan unconstitutional and indicated it would *Page 401 
order redistricting based on the 1970 census before the 1972 election, giving the legislature until July 1, 1971, to redistrict or the court would undertake "appropriate relief." Likewise, we find the district court in Chavis v. Whitcomb (S.D. Ind. 1969),307 F. Supp. 1362, making this similar statement, at p. 1367:
"However, the plan adopted herein is provisional in nature and probably will be applicable for only the 1970 election and the subsequent 2-year period. This is true since the 1970 census will have been completed in the interim, and the legislature can very well redistrict itself prior to the 1972 election . . . ."
In spite of the constitutional mandate to apportion in a timely fashion, if census data necessary to perform that duty does not exist, no fault can be found in delaying apportionment until adequate population data is available. However, as I will point out, there has been a continuous flow of increasingly more detailed Federal census data relating to the population breakdown in all Wisconsin counties since January, 1971, and such data now available to all counties appears virtually complete. As will be subsequently noted, in fact, the official publication of the earliest of such Federal census data in January, 1971, may arguably require apportionment of counties by January, 1972, even under a narrow interpretation of the provisions of sec. 59.03
(2) (c), Stats., and even in the absence of constitutional considerations. Be that as it may, it is the actual availability of Federal census data during 1971, in a form usable by counties for apportionment purposes, which actually dictates my response to your question, since I find it extremely difficult to conceive of any circumstance which would justify the failure of a county possessed of such census data to affect apportionment sometime within 1971. I, therefore, feel it necessary to describe some of the printed reports and other means which were utilized to disseminate 1970 census statistics in reference to population.
Although printed reports are no longer the only means by which U.S. Bureau of the Census data is distributed, they have long been the basic source for census information. *Page 402 
Three printed reports of population counts are issued by the Bureau of the Census. They are designated as "Preliminary Reports," "Advance Reports" and "Final Reports." The first of these reports represent preliminary field counts, but the Advance Reports include the first of what are intended to be "official" counts of population available for use in redistricting. See "1970 Census Information Available for Redistricting" at page 2 (Issued July, 1970, by U.S. Bureau of the Census). The most significant of these reports, for the purpose of this opinion, is designated "Final Population Counts, PC(VI)-51." The cover of the 1970 census of population "Advance Report PC(VI)-51 Wisconsin," which is dated December, 1970, describes its contents, in part, as follows:
"This report presents final 1970 census statistics on the number of inhabitants of the State and its counties, classified by urban and rural residence. In addition, figures are shown for each county subdivision, each incorporated place, and each unincorporated place of 1,000 or more.
"The figures presented here are being issued in advance of their publication in Final Report Series PC(1)-A. The final report for this State will be issued within the next few months." (Emphasis added)
The fact that this Advance Report purported to contain "final population counts" is of significance in reference to the question here under consideration, inasmuch as the February 3, 1965, Report of the County Board representation Committee to the 1965 Legislature, which recommended the enactment of sec. 59.03 (2) (c), Stats., in its present statutory form, indicated, at page 6:
"s. 59.03 (2) (c) establishes the procedure to be followed in apportioning supervisory districts. When the federal decennial census figures are final, the secretary of state certifies to each county board chairman the population of each municipality in the county. The county board then has one veal in which to submit the supervisory district apportionment plan to the secretary of state." (Emphasis added)
Unfortunately, the so-called "final" status of the Wisconsin PC(VI)-51 Report was qualified somewhat by more detailed *Page 403 
statements within the report. For instance, the report indicated that the detailed distributions shown in the report had not been revised to reflect certain errors discovered after the tabulations were made and that further information would be provided in the PC(1)-A Final Report for Wisconsin. However, except for the noted errors (which appeared to be minimal), the report contained the same population statistics for each town, village and city as subsequently published in the final PC(1)-A Report certified by the Secretary of State in September, 1971.
In January, 1971, the Bureau of State Planning, Wisconsin Department of Administration, published, as "final," population count data extracted from PC(VI)-51 in a state document designated "Advance Report on 1970 Census of Population in Wisconsin." This Report was distributed throughout the state in January, 1971, and copies were forwarded during that month to the county clerks of all Wisconsin counties.
The U.S. Bureau of the Census report designated "U.S. Census of Population: 1970 NUMBER OF INHABITANTS Final Report PC(1)-A51. WISCONSIN," is the most pertinent of the final census reports for the purpose of this opinion. It is a final report which contains the final official population counts for the same areas as the PC(VI)-51 Report, as well as certain other population statistics for areas designated under Federal guidelines as "urbanized areas" and "standard metropolitan statistical areas." This report becomes part of Volume 1, "Characteristics of the Population," of the permanent bound census reports. It was this PC(1)-A Report which was certified by the Secretary of State to the various counties on September 22, 1971.
Both PC(V1)-51 and PC(1)-A51 Reports for all states should include population statistics for local units of government, such as designated in sec. 59.03 (2) (c), Stats., and conceptually at least, the population data reported in both in reference to such units, should be identical. Although, as noted, the two Wisconsin reports were not identical, the few corrections noted in the PC(1)-A Report only affected small areas of 6 of our 72 counties. Regardless, it is important *Page 404 
to note that generally speaking, neither report contains much more than "the population of each town, village and city in the county" mentioned in sec. 59.03 (2) (c), Stats. Thus, regardless of which of the two reports are certified, it is obvious that neither report contains the more sophisticated census data required by most counties in order to satisfy the standards which must be met by present day apportionment efforts in order to insure equal representation. However, it does appear that apportionment data of the type required for such definitive redistricting of county boards already existed and was already available for study and use some time prior to the certification of the PC(1)-A Report. I consider this fact to be of far greater significance than the specific date of certification by the Secretary of State, particularly under circumstances where counties had already been informed of the contents of the PC(V1) Advance Report for Wisconsin in January, 1971. The more detailed information to which I make reference is largely a result of the new U.S. Bureau of the Census computer summary tape program (basically a three-tape series). Information from these tapes is normally disseminated through the above mentioned Bureau of State Planning.
The PC(V1) Report was extracted from what is called the "First Count Summary Tapes." This tape, received by the Bureau of State Planning early in 1971, also contained the population counts for all enumeration districts (small areas with an average population of about 800) and block groups (subdivisions of census tracts with an average population of about 1,000) in the state. This information arranged by county, town, city and village, was made available in printed form as an appendix to 1971 Senate Resolution 16, adopted March 18, 1971. Subsequently, over 290 pages of block-by-block population count statistics (based on U.S. Bureau of the Census Galley Proofs), were made available in printed form as an appendix to 1971 Assembly Resolution 30, adopted August 21, 1971. At about the same time, on August 23, 1971, the Bureau of State Planning received its second count tapes of population counts by census tract (average population of about 4,000) and on August 26, 1971, it received the last of the three series of tapes (detailed block-by-block statistics). *Page 405 
The third count tapes are being used to insure the accuracy of the data contained in 1971 Assembly Resolution 30.
Given the foregoing facts, it is evident that the importance of the date on which the Secretary of State forwarded his formal certification of 1970 census data, is more apparent than real. Of far greater importance is the obvious legislative mandate of sec. 59.03 (2), Stats., directing county boards to proceed with the apportionment of supervisory districts "as soon as practicable" following every Federal decennial census, to the end that "each supervisor shall represent as nearly as practicable an equal number of persons." After all, such statutory mandate but echoes what is already law in Wisconsin by virtue of the State and Federal Constitutions. Therefore, as demonstrated by State exrel. Sonneborn v. Sylvester, supra, counties should appreciate that the judiciary stands prepared to enforce such legislative directive and insure that no infirmity therein results in denial of the equal protection guarantees of Art. I, sec. 1, Wis. Const., and theFourteenth Amendment, U.S. Const.
Understood in this contest, certification by the Secretary of State is more properly viewed as a simple statutory device primarily designed to expedite future apportionment of supervisory districts by insuring that counties are informed of the determination of the Federal Government as to the population of each town, village and city in each county. Although such certification might reasonably be expected to be first among the events which obligate Wisconsin counties to develop sophisticated reapportionment proposals, this need not necessarily be so. Since certification is a mere technical part of the machinery intended to insure prompt apportionment, delay in certification, for whatever reason, could hardly represent a legitimate basis for a county to fail or refuse to proceed to develop an apportionment plan or plans utilizing the detailed census data available. At best, the absence of certification under these circumstances could only be viewed as having the possible effect of delaying the act of apportionment until there was certification, i.e., certification would only be considered as a condition precedent to the final action adopting the apportionment plan. *Page 406 
The phrase "but not more than one year," which appears in the second sentence of present sec. 59.03 (2) (c), Stats., did not appear in the original draft version of the statute, but was added to the draft by the above mentioned County Boards Representation Committee at its December 9, 1964, meeting. The minutes of that meeting indicate the following, at page 8:
"The committee then considered § 59.03 (2) (c) of LRB-217. Committee members agreed that the language of the draft and the committee's intent is that each county shall reapportion every 10 years following each federal decennial census, even though there may be no substantial change in district lines. Mr. Martin felt that the phrase `but not more than 1 year' should be inserted in line 3 following the phrase `as soon as practicable.' He then moved, seconded by Mr. Savage, that this phrase be inserted in the draft . . . ."
The motion was unanimously adopted without further discussion.
In my opinion, the one-year provision in sec. 59.03
(2) (c), Stats., can in no way be considered as limiting the constitutional mandate requiring timely apportionment. In fact, the provision appears to have been intended to act as further assurance that county boards would promptly apportion following every decennial census. Certainly, the statute could not in any sense be properly interpreted as granting county boards the option to defer or delay apportionment up to one year after the population certification. Such interpretation would be based on the unexceptable assumption that the legislature intended to completely frustrate efforts to insure equal representation based on prompt apportionment. Nor do I believe the statute assumes the need of utilizing one year, or any other lengthy period of time, on any county apportionment. I note, for instance, that ch. 20, Laws of 1965, which set forth the new county board reorganization requirement for the very first time and directed that the first elections under the act be held in 1966, did not become effective until April 21, 1965. Since the law also gave the Secretary of State an additional 30 days after that effective date to certify the information specified in sec. 59.03 (2) (c), Stats., it was apparently anticipated that the very first *Page 407 
apportionment, under what was then an entirely new procedure, would be accomplished in the approximately seven months remaining prior to January 1, 1966. This is of significance when it is appreciated that at that time counties not only lacked the practical experience or the beneficial effect of a previous apportionment under that statute, but that they were required to apportion utilizing estimates of population and five-year old census data instead of the highly detailed and usable census information which is available today. Nevertheless, even with these handicaps, 19 counties had apparently certified apportionment plans as of September 10, 1965.
It is evident that the legislature intended to design an orderly and uniform transition of all county boards under present sec. 59.03 (2), Stats., through the election process and in accord with equal protection principles, every two years, i.e., at the spring election in even numbered years. I find nothing to suggest that the legislature intended that apportionment of county supervisory districts after every Federal decennial census would constitute an exception to this general legislative plan. Thus, it seems completely unreasonable to interpret sec. 59.03 (2) (c), Stats., in such a way as to allow four years to pass before the first election of county supervisors based on the 1970 census. If such a delay had been anticipated or intended by the legislature, such intent could have easily been made evident. Furthermore, if some county boards apportion prior to January 1, 1972, while others delay until some later time utter the Spring 1972 election, it would be possible for Wisconsin counties to be operating through county boards elected under two different decennial census, though all boards were elected at the same spring election. I cannot conclude that the legislature intended such a situation to exist. It appeals far more logical to conclude that the legislature expected and intended that all county supervisors under sec. 59.03
(2), would be elected from newly apportioned districts at the first election for county board supervisors to be held after the 1970 census, i.e., in the even numbered year two years thereafter — 1972. Furthermore, as previously pointed out in this opinion, county boards are obliged to accomplish apportionment of their county supervisory districts by the earliest date candidates *Page 408 
may circulate nomination papers for county supervisor, presently set by statute as January 1, 1972.
Finally, I feel I should further advise you that in the event any county board fails to apportion county supervisory districts in preparation for the 1972 Spring election, I consider the intervention of the judiciary to insure such apportionment most plausible. While the courts have long resisted judicial involvement in the detailed correction of apportionment inequities, the Federal and State apportionment cases of the 1960's and early 1970's leave no doubt but that the courts will refuse to stand idle in the face of a denial of equal protection caused by chronic indecision and fruitless legislative efforts to find practical and equitable as well as expeditious solutions to apportionment problems.
RWW:JCM