William T. KELLY et al., Petitioners,

v.

Governor Dale BUMPERS et al.,
Respondents,

Ray Kimball and Glen Dorsey, Arkansas
State Senator Oscar Alagood,
Intervenors.

No. LR–71–C–159.

United States District Court,
E. D. Arkansas, W. D.

March 21, 1972.

Eugene Mazzanti, Little Rock, Ark., and Charles R. Garner, Fort Smith, Ark., for petitioners.

Ray Thornton, Atty. Gen., and Roger A. Glasgow, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for respondents.

Gordon B. Carlton and John B. Hainen, DeQueen, Ark., for intervenors Kimball and Dorsey.

A. James Linder, Little Rock, Ark., for intervenor Oscar Alagood.

Before STEPHENSON, Circuit Judge, HENLEY, Chief District Judge, and HARRIS, District Judge.

*Memorandum Opinion*

HENLEY, Chief District Judge.

This suit, in which federal subject matter jurisdiction is established, was brought for the purpose of invalidating the apportionment of seats in the Legislature of the State of Arkansas which was effected last July by respondents who are the members of the Arkansas Board of Apportionment created by Amendment 45 to the Constitution of the State of Arkansas. Additional respondents are the members of the Arkansas State Board of Election Commissioners, a State agency that performs important functions in connection with the general elections held in Arkansas every two years.

Petitioners are four citizens and qualified electors of Pulaski County (Little Rock, North Little Rock, etc.) and Sebastian County (Fort Smith), Arkansas. An incumbent Democratic Senator from Pulaski County and two citizens of Sevier County in the southwestern part of the State were permitted to intervene and align themselves with petitioners.

Three of the four petitioners are affiliated with the Republican Party. One of them is a member of the House of Representatives from Sebastian County. Another is at present the Chairman of the Pulaski County Committee of the Republican Party. Still another has been an unsuccessful Republican candidate for the Legislature. The record does not disclose the political affiliation of the fourth petitioner. She is a Negro woman and a member of the NAACP; it does not appear, however, that that organization officially authorized her to represent it in this suit.

The suit was permitted to proceed as a class action, and notice of its pendency was published as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure. However, no organized groups in Arkansas, of which there are a number, and which would ordinarily be expected to take an interest in a suit of this kind came forward to participate in the case

or asked to be excluded from the effect of any decree rendered herein.

By agreement the evidence in the case, consisting of oral testimony and documentary material, was heard by the writer sitting alone. The testimony was transcribed and made available to all three of the Judges, and the case was briefed and argued before the full Court. We pause to say that the procedure followed here would seem to be an efficient and time-saving method of submitting a three judge case which presents no real problems as to the demeanor of witnesses or as to their credibility.

This, of course, is an election year. In February the Arkansas Legislature met in special session and passed legislation advancing the dates of primary elections to late May and early June and fixing as filing dates for candidates, including legislative candidates, the period beginning on March 14 and closing on April 4. This case was argued and finally submitted on March 3.

In view of the time element and the importance of the case to prospective legislative candidates, the Court considered the materials before it as expeditiously as possible and unanimously agreed that the petition along with the interventions should be dismissed with prejudice, and that a decree to that effect should be entered in advance of the filing of a formal opinion. Such a decree was entered on March 10 with the stipulation that an opinion would be filed in due course. This opinion is now filed.

The Arkansas Legislature, at times called the General Assembly, consists of a Senate of 35 members and a House of Representatives consisting of 100 members. The present General Assembly and its immediate predecessors were elected under the apportionment approved in Yancey v. Faubus, Governor, E.D.Ark., 1965, 251 F.Supp. 998, aff'd on motion, Crawford County Bar Ass'n v. Faubus, 383 U.S. 271, 86 S.Ct. 933, 15 L.Ed.2d 750. Under the present appor-

tionment a significant number of both Senators and Representatives have been elected from multi-member districts.

It is the function of the Board of Apportionment to make a reapportionment of the Legislature following each federal decennial census. Following the taking of the Census of 1970, the Board commenced its work in January 1971 and filed the plan here under attack on July 19. The plan provides that all 35 Senators are to be elected from single member districts, that the House is to consist of 100 members elected from 84 districts, and that 10 of those districts, including five in Pulaski County, are to be multi-member. Those multi-member districts will elect 26 Representatives.

Petitioners and intervenors contend, and respondents deny, that the Board's plan is violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States as construed by the Supreme Court of the United States in a line of cases beginning in 1964 and ending in 1971. Reynolds v. Sims, 1964, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506; Maryland Committee For Fair Representation v. Tawes, 1964, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 1964, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sincock, 1964, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; Lucas v. 44th General Assembly, 1964, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; Fortson v. Dorsey, 1965, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401; Scott v. Germano, 1965, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477; Swann v. Adams, 1966, 383 U.S. 210, 86 S.Ct. 767, 15 L. Ed.2d 707; Burns v. Richardson, 1966, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376; Swann v. Adams, 1967, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501; Kilgarlin v. Hill, 1967, 386 U.S. 120, 87 S. Ct. 820, 17 L.Ed.2d 771; Kirkpatrick v. Preisler, 1969, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519; Wells v. Rockefeller, 1969, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535; Ely v. Klahr, 1971, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352; Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363; Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399. Those decisions were foreshadowed by Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663; Gray v. Sanders, 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821; and Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481.

. Considered collectively, those cases establish the following general principles applicable to State legislative apportionment:

■ The Equal Protection Clause of the Fourteenth Amendment requires that every member of both Houses of a bi-cameral State legislature represent, "insofar as practicable," the same number of people. This requirement is at times called the "one man, one vote" principle, and we will refer to it at times as the "1:1" principle.

■ The principle just mentioned does not require exact mathematical equality in representation. The Supreme Court recognizes that such exactitude is not possible, but the principle must be applied insofar as practicable. In applying that principle some consideration may be given by apportioning authorities to factors like geography, the integrity of subdivisions like counties, cities, or towns, and communities of interest; but those considerations and perhaps some others that may be appropriate must be subordinated to the overriding requirement of substantial equality of representation.

■ While it was thought by some in the mid-1960's that some variations from "ideal ratios" between representatives and voters would be permissible automatically as "de minimis," it is now established that no variation is automatically permitted. Kirkpatrick v. Preisler, supra. On the other hand, rather substantial variations may be tolerable constitutionally if satisfactorily justified. Abate v. Mundt, supra.

■ There are many political scientists who consider that single member districts are for various reasons

preferable to multi-member districts, and in a number of cases above cited the claim has been made that multi-member districts are unconstitutional per se. However, multi-member districts have survived those attacks. Whitcomb v Chavis, supra, establishes that a multi-member district is not per se either constitutional or unconstitutional. The constitutionality of such a district or a system of such districts is simply "justiciable." Multi-member districts are unconstitutional where they discriminate against minority racial or political groups residing within those districts. But, discrimination is not presumed, and the burden is on those who attack multi-member districts to establish their discriminatory nature. They do not have to be justified in the first instance by the apportioning authority.

Arkansas is a diverse State as far as its geography and economy are concerned. It consists of 75 counties and numerous cities and towns. In some parts of the State roads and bridges are more numerous and better than in others. There is not an even distribution of people throughout the State; there are some large counties with very small populations; other counties are densely populated.

The population is not racially homogeneous. There is a large Negro minority concentrated in parts of the southern, eastern, and central portions of Arkansas. In most of North Arkansas there are very few Negroes; in some counties in that section of the State there are no Negroes. Arkansas also has a small population of Asiatic origin, but the numbers of that minority are too small to be politically significant.

For various reasons, principally economic, residential housing in many Arkansas cities, including cities like Little Rock, North Little Rock, Pine Bluff, or El Dorado, is racially segregated, and the Negroes live in readily identifiable neighborhoods.

As far as political parties are concerned, the State is generally divided between Democrats and Republicans. There is also the comparatively small American Independent Party. As is well known, Arkansas is predominantly a Democratic State. For almost a century prior to 1966 the Republicans were unable to elect a constitutional officer in Arkansas. Arkansas has regularly supported Democratic nominees for President and Vice President of the United States. Both United States Senators and three of Arkansas' four Congressmen are Democrats; and all of the respondents in this case are members of the Democratic Party, except the Chairman of the Republican State Committee who is an ex officio member of the Board of Election Commissioners.

However, there has always been some Republican strength in Arkansas. That strength tends to be concentrated in the predominantly rural counties of North Arkansas and in some of the larger cities like Little Rock and Fort Smith. And generally the Republican Party has been able to capture one or more, but never more than a few, seats in the Legislature. The present Legislature includes two Republican Representatives and one Republican Senator.

There is some evidence that the traditional allegiance of Arkansas voters to the Democratic Party is not as unwavering as it once was, at least in certain circumstances and at certain political levels. In 1966 the Republicans elected the Governor and Lieutenant Governor and one Congressman; they did the same thing in 1968. In the presidential election of that year Governor George Wallace of Alabama, the candidate of the American Independent Party, carried Arkansas. In the General Election of 1970 the Republican candidates for Governor and Lieutenant Governor lost their races, but the Republican Congressman was reelected handily. While the Republican candidate for Secretary of State lost to the Democratic incumbent, the former was able to poll 217,752 votes as compared to the latter's 360,209.

As the work of the Board proceeded into the spring of 1971, it was decided

that guidelines should be adopted, and that course was taken at a meeting of the Board held on May 17. The guidelines were as follows:

"The Board of Apportionment considers it desirable at the outset of this meeting to establish and adopt certain basic standards, guidelines and statements of purpose to be followed in arriving at any final plan of apportionment for the House and Senate of the Arkansas General Assembly.

\* \* \* \* \* \*

"The primary and over-riding consideration which has governed the Board's actions in arriving at a plan of apportionment is that of 'substantial population equality' between the various districts of each house. At the same time the Board realizes that mathematical perfection of equality, though a laudable goal, is incapable of achievement and that any population variances which result between the districts, no matter how minimal, must be justified on the basis of some rational state policy. Some of the policies which the Board considered in this respect are as follows:

"(1) To maintain county lines intact wherever possible because these are important natural, historical, geographical and political boundaries within which individuals of a certain identity of interests reside;

"(2) To minimize so far as possible a disruption of the electoral process and procedures of registration, ballot printing and voting;

"(3) To maintain districts which have some or all of the qualities of geographical cohesiveness, identity of common political and economic interests, contiguous territory, compactness of area, and absence of natural barriers; and

"(4) To assure so far as possible that cognizable and identifiable minority groups are not submerged in such a way as to deny their members effective representation.

"With these considerations in mind, and fully cognizant of the provisions of Amendments 23 and 45 to the Constitution of Arkasas, as viewed in the light of decisions of the Arkansas Supreme Court, the federal courts, and the United States Supreme Court, the Board has determined that a plan which establishes a House of Representatives of 100 separate districts and a Senate of 35 separate districts is the most desirable and the most constitutionally defensible approach. Such an approach of adopting the 'single-member district' concept is desirable because it most nearly accomplishes the ideal of representative democracy with the elected representatives of the people responsive to an identifiable constituency of such a size that its voice may be heard. Single-member districts offer optimum results in attaining population equality. From a practical standpoint, although such a plan might inconvenience the electoral process in certain cases, at the same time it offers the maximum in legal and constitutional defensibility, and there should be no apprehension among election officials or candidates that it might be overturned. It is as stable as it is defensible, and firm plans and procedures may be based upon it."

It is clear from the minutes of the Board and from other materials of record that until late May or early June the Board contemplated structuring both Houses on the basis of single member districts exclusively. However, at a meeting of the Board held on June 28, which was a little over two weeks after Whitcomb v. Chavis, supra, was decided, it was proposed that the guidelines be amended so as to authorize some multimember districts for the House "where the use of such districts would provide a cohesive community of interest and minimize the disruption of the election process and to provide for assurance that any identifiable minority groups not be submerged." That proposal was amended so as to stipulate that "such districts

be used sparingly, and that no district should include a significant percentage of the members of either House," and the proposal as amended was adopted unanimously.

At a meeting held on the following day a majority of the Board approved in principle a House that would include 10 multi-member districts from which 26 Representatives would be elected.

As stated, the Board completed its work and filed its report with the Secretary of State on July 19, 1971.

We think that it is obvious that no plan can be devised for the apportionment of the Arkansas Legislature that will suit all interested individuals and groups, and that probably no plan can be devised that is free from defects or upon which improvements could not be made. One Board of Apportionment might take one approach to a given problem; another Board might take a different approach. Members of the same Board can differ from each other on principles and on details; the record at least suggests that there have been some differences of opinion among members of the respondent Board.

■■ It is important, therefore, to define our jurisdiction and function. We do not sit as a panel of political scientists or as a super Board of Apportionment. It is not our function to substitute our views for those of the Board in areas in which the Board has exercised a legitimate and constitutional administrative or legislative judgment. It is not for us to determine whether the plan put forward by the Board is a "better" plan or a "worse" plan than alternatives suggested by petitioners and intervenors. The question before us is whether the Board's plan is a constitutionally permissible plan. If it is, our inquiry is at an end. If it is not, then it is our duty to mould relief but at the same time to take care not to go beyond what the constitutional necessities of the case may require. Whitcomb v. Chavis, supra, 403 U.S. at 160–161, 91 S.Ct. 1858, 29 L.Ed.2d 363.

It is necessary for us to look at the plan in all of its aspects as a whole. We do not look at the Senate without regard to the House or vice versa. However, for purposes of discussion we deem it well to consider the Houses separately, starting with the Senate.

### The Senate

According to the Census of 1970 the population of Arkansas was 1,923,295 so that the ideal ratio between Senators and constituents would be 1:54,951.

■ In laying out its districts for the Senate the Board found it necessary in a number of instances to cross county lines, a procedure forbidden by section 3 of Article 8 of the Constitution of Arkansas as carried forward into Amendments 23 and 45. This the Board clearly had the right to do in order to achieve the substantial equality of representation required by the apportionment decisions of the United States Supreme Court, supra; see U.S.Const., Art. VI, Clause 2.

Looking first simply at numbers and laying to one side geographical and other considerations, we find that in 14 of the 35 Senate districts populations are less than 1 percent above the ideal, and that in 10 districts populations are less than 1 percent below the ideal. In four districts the variations are more than 1 percent but less than 2 percent above the ideal, and in six the variations are more than 1 percent but less than 2 percent below the ideal. In only one district, which is District 34 consisting of Phillips County and part of Lee County in extreme Eastern Arkansas, does the variation exceed 2 percent. In that district the variation is 2.04 percent above the ideal.

The smallest Senate district formed by the Board, as far as population is concerned, is District 15 which consists of Garland County, including the City of Hot Springs, as a political unit. The variation in Garland County is 1.49 percent below the ideal.

Ignoring for the moment the difference between the populations of District 34 and District 15, we find that the other variations while not automatically de minimis are minor and constitutionally unobjectionable if they are justified by the other factors which the Board took into consideration in laying out the Senate Districts.

In that connection we find that the Board took into consideration the desirability of maintaining individual counties intact where possible, the desirability where possible of conforming Senate district lines to House district lines, communities of interest between counties or parts of counties, accessibility of one part of a district to other parts of a district, and similar factors which we consider permissible provided that those factors were held in proper subordination to the paramount requirement of the 1:1 principle.

We further find that the lay-out of Senate districts by the Board was not irrational or unreasonable. There is no persuasive evidence that the State was gerrymandered for the purpose of protecting incumbent Senators or of discriminating against or diluting the voting strength of minority groups such as blacks or Republicans, or that the Senate districts do in fact discriminate against such groups.

Petitioners called as an expert witness Mr. Warren Bass of Bryant, Arkansas, a certified public accountant who has an extensive practice in Central Arkansas and perhaps in other parts of the State as well. Mr. Bass introduced in evidence maps depicting his idea of a proper apportionment of the Senate and testified in detail about them. We have given careful consideration to his maps and to his testimony in comparison with the Board's maps and the testimony produced by the Board in support of its Senate plan.

We think it may be said that the districts depicted by the Bass maps are more compact than the districts defined by the Board, and that the Bass districts show somewhat less variations in population from the ideal than do the Board's districts. However, Mr. Bass testified that in drawing his districts he considered numbers of people and compactness in the size of districts and nothing else. The Board considered other factors as well, and we think that it was justified in so doing. Another basic difference between Mr. Bass's approach to the problem and the Board's approach to it was that the Board allotted five senators to Pulaski County; those five senatorial districts did not include all of Pulaski County, and that part of the County that was not included in them was allotted to a district made up primarily of Perry, Pope, and Yell Counties as intact units. Mr. Bass, on the other hand, lumped all of Pulaski County, all of Perry County, and all of Saline County together and allotted that general area six senatorial districts. The Pulaski County intervenor complains in that connection about the fact that the western part of his County has been severed from the remainder.

Another difference between the Bass plan and the Board's plan is the way in which part of the western part of the State was districted. From Red River, North to the Missouri line the western border of Arkansas is the Oklahoma State line. Along that line lie the Arkansas counties of Little River, Sevier, Polk, Scott, Sebastian, Crawford, Washington, and Benton. Little River County lies between Red River on the South and Little River on the North. Sevier, Polk, Scott, and Sebastian Counties lie between Little River and the Arkansas River. Crawford, Washington, and Benton Counties are North of the Arkansas River. Those counties are traversed from North to South by U. S. Highway No. 71, which is a paved and heavily traveled highway and which is by no means in the best of condition; still, it is passable at all seasons of the year except during brief periods when the hilly or mountainous parts of it may be impassable due to snow and ice.

The Board placed those counties and some other territory in Districts 6, 7, 8, 9, and 10. District 9 consists basically of the City of Fort Smith which is almost an ideal senatorial district in that it has a population of 54,892. District 6 consists of all of Benton and part of Carroll Counties; District 7 is all of Washington and part of Crawford Counties; District 8 consists of the rest of Crawford County and all of Franklin and Logan Counties. The principal axis of Districts 6, 7, and 8 runs from West to East. The principal axis of District 10, on the other hand, runs markedly from North to South. The District includes that part of Sebastian County which is not in District 9, and all of the Counties of Scott, Polk, and Sevier. The intervenors from Sevier County complain specifically about the lay-out of District 10 insisting that they are hopelessly outnumbered by the voters in the more northern counties of the District with whom they claim to have little in common. The petitioners complain about District 10 because it puts the southern part of Sebastian County said to be rather strongly of the Republican persuasion in the same district with overwhelmingly Democratic counties.

Mr. Bass, like the Board, gave Fort Smith a district of its own. He dealt with the counties North of the Arkansas River in a somewhat different manner. And, he dealt with the counties in District 10 in a substantially different way. He put all of Sebastian County outside Fort Smith into a district including all of Logan and Johnson Counties to the East and Northeast; and he put Scott and Polk Counties into a very large but relatively sparsely settled district including Montgomery, Pike, and Clark Counties; and he put Sevier County into a district made up of it plus Howard, Hempstead, and Nevada Counties, an arrangement that might well be preferable in the eyes of the Sevier County people to the Board's alignment of them with Polk, Scott, and part of Sebastian Counties.

Turning to Northeast Arkansas it is to be observed that the Board's District 30 is made up of parts of Craighead and Poinsett Counties and includes the populous and growing City of Jonesboro; the District has a population of 55,238 which is about one half of one percent above the ideal. Mr. Bass puts all of Craighead, including Jonesboro, and part of Greene and part of Poinsett Counties into a single district having a population of 54,844, which is about two tenths of one percent below the ideal. The Board's District 29 includes all of Craighead County not included in District 30, plus all of Greene and Clay Counties. The population of that District is 55,574. Mr. Bass put most of Greene and all of Clay and Randolph Counties into a single district having a population of 54,892.

Other differences between the Board's plan and the Bass plan for the Senate might be mentioned, but, we think that those that have been taken up are sufficiently illustrative.

It may be conceded that in certain aspects the Bass plan is a "better" plan for the Senate than is the plan of the Board. On the other hand, the Bass plan has its own defects. For example, his district that includes southern Sebastian, Scott, and Polk Counties and lumps them with more easterly counties appears to be as large and awkward, or more so, than the Board's plan dealing with the same counties. Had the Board chosen to adopt the Bass plan or one essentially similar to it, we certainly would not say that it would have acted unconstitutionally in so doing. On the other hand, we are not persuaded that the advantages of the Bass plan, to the extent that they exist, are sufficient to demonstrate that the Board's plan is unconstitutional.

Turning back now to the population difference that exists between District 34 and District 15, we might point out to begin with that Mr. Bass left Garland County intact as the main part of District 15, but added to it two town-

ships out of Hot Spring County so as to bring the population of the District up to 54,829. His dealing with District 34 was more radical. Bass severed Lee County entirely from Phillips, and put the part of Lee County that the Board had lumped with Phillips into a district including parts of St. Francis, Monroe, and Prairie. That District would have a population of 55,144. Phillips County was left intact, but was placed in a single district with Arkansas County which is separated from Phillips County by part of Monroe County and White River. The Bass district consisting of Phillips and Arkansas Counties would have a population of 55,212.

We find that no great difficulty would be encountered by increasing the population of District 15 along the line suggested by Mr. Bass or perhaps along some other line, but we do not see that anything practical would be gained by doing so. The effectiveness of the representation of the people of Garland County in the Senate would not be substantially increased by adding a few hundred people to Garland County from some other county, and it is at best doubtful that their representation would be improved substantially. Moreover, Hot Spring County has already been divided by the Board in that some of the County's townships have been joined to Saline County to form District 16.

Correcting the population situation in the Board's District 34 is a more complicated matter in that it would involve the restructuring of several Eastern Arkansas districts and would involve serious logistical difficulties described in the evidence.

██ While the departures of the populations of District 15 and District 34 from the ideal, and while the difference in the populations of the two Districts give the Court some concern, we do not think that they are so serious or so unjustified as to require us to disapprove the Board's plan for the Senate or to require changes in individual district lines.

Before leaving the Senate phase of the case, it should be said that we are disturbed by the action of the Board in placing the people residing in four Enumeration Districts in the western part of Pulaski County into District 14 which consists of all of Perry, Pope, and Yell Counties and six townships in Conway County. The total population of District 14 is 54,301, including 4,575 Pulaski County residents. While the population of Perry County is only 5,634, and while only 1,277 people live in the six Conway County townships included in District 14, the population of Pope County, which includes the City of Russellville, is 28,607, and the population of Yell County is 14, 208.

Western Pulaski County is a very rapidly growing area, and the people who live there now and who may be expected to live there in the future have very little, if any, immediate community of interest with the people living in the other counties in the District. Further, the Pulaski County people incorporated into District 14 all live South of the Arkansas River whereas Pope County and most of Conway County are both North of the River.

██ We think that a strong policy argument can be made that Pulaski County should not have been divided, at least as it was, for the purpose of senatorial districting. However, we are unpersuaded that the decision made by the Board was beyond the permissible scope of its judgment.

So much for the Senate.

### The House of Representatives

While the attack of petitioners and intervenors on the Board's plan for the Senate was pressed seriously, it appears to us that the main thrust was against the House plan and that the principal object of the attack was the multi-member districts, particularly those in Pulaski County.

Two aspects of the Board's plan for the House initially draw attention. First, it is noted that a substantial num-

ber of multi-member districts containing identifiable and localized minorities have been set up when it is clear that the Board could have constructed a House made up entirely of single member districts as was the original intention of the Board. Moreover, the Board in apparent violation of its own guidelines did not make use of multi-member districts "sparingly." A little less than one eighth of the total number of House districts are multi-member, and those districts will elect more than 25 percent of the total membership of the House. Further, while the Board perhaps literally followed the mandate of the amended guidelines which specified that no substantial number of Representatives would be elected from a single multi-member district, the fact remains that the 15 Representatives allotted to Pulaski County will all be elected from multi-member districts.

Next, the ideal House ratio called for by the "1:1" principle is 1:19,232, and variations from that ratio in the respective House districts are more substantial than the variations from the ideal which appear in the Senate plan and which have been discussed.

 We find that the Board in undertaking to apportion the House seats gave preponderating weight to the principle of equal representation, as it was required to do, and that it gave subordinate consideration to the 75 counties in the State as political subdivisions as well as to the larger cities and towns as such subdivisions; consideration was also given to factors such as geography, accessibility, community of interests, correspondence of Senate District lines and House District lines, and to some extent the convenience of voters and election officials.

As far as House apportionment is concerned, Arkansas counties fall into a number of definite categories. Some of the larger counties have populations sufficient to justify the allotment to them of two or more Representatives. Notable examples are Pulaski, Garland, Jefferson, Sebastian, Craighead, and Washington. Other counties would be entitled to more than one but less than two Representatives; Miller County is a good example falling into this category. Some counties, for example Boone and Hempstead, come close to qualifying for exactly one Representative. Still other counties standing alone are too sparsely populated to be entitled to a Representative.

In dealing with counties of the type last mentioned, the Board, where possible, would combine one small county with an adjoining small county as it did in the case of Nevada and Pike Counties in Southwest Arkansas and in the case of Cleburne and Van Buren Counties in North Central Arkansas. Where that approach was not possible it was necessary to divide the small counties and incorporate the respective parts into districts made up primarily of one or more larger counties.

The Board deemed that approach necessary in the case of Sevier County, and the principal complaint of the Sevier County intervenors is about the action taken with respect to their small county. According to the Census of 1970 the population of Sevier County was 11,272, far too few people to entitle the County to a Representative of its own. The Board took seven townships located in the northern and eastern parts of Sevier County containing 7,975 people and put them with Howard County to the East with a population of 11,412 to constitute single member District 18 with a total population of 19,387. The Board then took the remaining five townships in Sevier County, located in the southern and western parts of the County and having a population of 3,297, and put them into single member District 21 along with Little River County and part of Miller County which District has a population of 19,290.

When, as in the case of Sevier County, the Board found it necessary to put component parts of a small county into districts dominated by larger counties, an

effort was made to draw the "cut line" so that the votes of the people of the smaller county assigned to a district including a larger county would have a substantial impact on elections in the overall district. That policy is well illustrated when it is observed that the Sevier County people placed in District 18 along with Howard County make up 41 percent of the population of the District, and the Sevier County people put into District 21 make up about 17 percent of the population of that District. It is reasonable to suppose that a Howard County candidate for the House in District 18 could not afford to ignore the votes and the wishes of 41 percent of his constituency, and that a Little River candidate for the House in District 21 could not afford to ignore the 17 percent of his constituency residing in Sevier County or the 24 percent of his constituency living in northern Miller County, which two minorities, perhaps coincidentally, make up 41 percent of the population of District 21.

Having discussed the Sevier County situation in some detail, we deem this a good point at which to dispose of the complaint of the Sevier County intervenors about the way in which their County has been handled by the Board. Evidence produced by those intervenors proves, and we find, that Sevier County is unitized geographically, politically, economically, and socially, and that problems affecting one part of the County tend to affect other parts of the County as well. And we will assume arguendo, although we do not find, that with Sevier County divided between District 18 and District 21 a Sevier County citizen cannot be elected to the House as long as that division exists. (That assumption involves the very doubtful proposition that regardless of the relative merits of legislative candidates residing in Sevier County or in the northern part of Miller County, Howard County voters will invariably vote for Howard County candidates, and that Little River County voters will always vote for Little River County candidates.) However, Sevier County is by no means the only small county in Arkansas, and what can be said of Sevier County can also be said of other counties of comparable size. Had the Board chosen to divide Howard County rather than Sevier, we might have heard the same complaints from Howard County people that have been made by the Sevier County intervenors.

In the course of the proceedings it was suggested by counsel for the intervenors that Districts 18 and 21 be consolidated into a single district with two members. Assuming that the Board might have done that, it does not follow that it was constitutionally required to do so. We think that in dealing as it did with Sevier County and its neighbors the Board acted within the permissible scope of its judgment, and that its decision should not be disturbed. Certainly, we would not be inclined to create or order created still another multi-member House district that the Board itself did not see fit to create.

Returning now to the main stream of our discussion of the House, the record reflects that some counties having sufficient population to justify an allotment of more than one but less than two representatives include a relatively large city or town. In dealing with such counties it was the policy of the Board in general to divide the county so that the city or town in question, with or without some rural townships, would constitute a single district. Miller County affords a good example.

Miller County had a 1970 population of 33,385. The county seat of Miller County is the City of Texarkana, Arkansas, which is located entirely in Garland Township. The Board took 37 Enumeration Districts in Garland Township having a population of 19,395 and used them to create District 22 which is essentially the City of Texarkana. As indicated certain portions of the Northern part of Miller County was placed in District 18, and the southern and eastern parts of the County were combined with Lafayette County on the East side of

Red River to make up District 23 having a population of 19,209.

What has been said down to this point is sufficient to describe in a general way how the Board went about its task of apportioning the House. Petitioners contend that the plan formulated by the Board violates the 1:1 principle; that the plan, including its multi-member aspect, discriminates against blacks, Republicans, and nonaffluent persons who may desire to run for the House; that the Board engaged in gerrymandering to protect certain incumbents; that the Board acted arbitrarily and without reference to proper criteria; and that the Board failed to follow its own guidelines.

We find that the guidelines adopted by the Board were adequate and permissible constitutionally. We do not consider that the Board was bound to follow the guidelines inflexibly in each and every instance in which a problem arose. In instances the Board departed to some extent from the guidelines, but we do not think that the departures, which were largely justified by the Board, were such as to make the overall action of the Board capricious or arbitrary. We do not find that the Board was guilty of any unconstitutional gerrymandering of district lines.

This brings us back to the questions earlier mentioned, namely, population variations and the use of multi-member districts in Pulaski County and in certain other areas of the State. We will consider the population variations first.

As has been said the ideal House ratio in Arkansas is 1:19,232. In order to determine the actual ratio existing in a multi-member district one divides the population of the district by the number of representatives allotted to it. We will look first at population variances in the 10 multi-member districts created by the Board.

Pulaski County is included in five districts with three seats allotted to each of those districts. Those districts are numbered 1–5. In District No. 5 the variation is zero. In District No. 1 it is 1.9 percent above the norm; in District No. 2 it is 0.86 percent above it; in District No. 3 it is .49 percent below the ideal; in District No. 4 it is .65 percent below.

Turning to the other multi-member districts we find that in District 10 in Washington County, which includes the City of Fayetteville where the main campus of the University of Arkansas is located, and which has two seats, the variation is .89 percent below the norm. District 15 is the urban district made up of the City of Fort Smith; it has three members, and the variation is 2.15 percent above the norm. District 35, which is the City of Hot Springs, has two seats and the variation is .31 percent below the norm. In District 68, which has two seats and which includes the City of Jonesboro where Arkansas State University is located, the variation is 5.01 percent above the ideal. And in District 84 which is made up of parts of Crittenden and St. Francis Counties and which includes the City of West Memphis, each of the two members will theoretically represent 19,110 people so that the variance is .58 percent below the norm. The total range of variation then, in the multi-member districts is from 5.01 percent above the norm in District 68 to .89 percent below the norm in District 10.

The degree of variation in the 74 single member districts may be expressed conveniently by means of the following table:

Table 1. Variations From The Ideal In Single Member Districts

| Percentage of Variation | Number of Districts | |
|---|---|---|
| | Above Norm | Below Norm |
| Less than 1 percent | 12 | 18 |
| 1–2 percent | 10 | 10 |
| 2–3 percent | 5 | 14 |
| 3–4 percent | 2 | 1 |
| 4–5 percent | 0 | 0 |
| 5–6 percent | 1 | 0 |
| More than 6 percent | 1 | 0 |
| | 31 | 43 |

The largest single member district is District 70 which is made up of Jackson County as a unit. The population of

that District is 20,452, and the variation is 6.34 percent above the ideal. The second largest single member district is No. 76 which is made up of the northern and western portions of Phillips County; it includes the City of West Helena but does not include the City of Helena proper. The population of that District is 20,380 which is a variation of 5.96 percent above the average.

The smallest single member district is No. 47 which consists of Cleburne and Van Buren Counties. It has a population of 18,624 with a variance of 3.16 percent below the ideal. The second smallest single member district is No. 37 which is located in eastern and southern Clark County; it includes the City of Arkadelphia where Henderson State College and Ouachita Baptist University are located. Its population is 18,808 with most of the people living in or in the immediate vicinity of Arkadelphia; the variation is 2.20 percent below the norm.

 The spread of variation among the multi-member House districts is 5.9 percent which is somewhat wider than the spread of variation among the Senate districts, but the difference is not striking. The spread of 9.5 percentage points between the largest and smallest of the single member House districts substantially exceeds the spread between the largest and smallest Senate districts and also substantially exceeds the spread between the largest and the smallest of the multi-member districts.

However, the single member district variance range of 9.5 percent is attributable to only five of the 74 of those districts. If we take out of the picture Districts 47, 70, and 76, which have been described, and if we also remove District 16 which consists of Scott County and part of Sebastian County, and District 60 which consists of Bradley County and part of Union County in South Arkansas, the range of variation from the norm in the remaining 69 single member districts does not exceed 3 percent either way, and in 50 of those 69 districts the variation does not exceed 2 percent either way.

When he testified in the case, Mr. Bass, who has been mentioned, had not prepared a plan whereby the seats in the House could be apportioned on the basis of single member districts exclusively. He testified that he could prepare such a plan, and we do not doubt that he could, and that if he took the same approach with respect to the House that he took with respect to the Senate, that is to say considering numbers and compactness and nothing else, he would produce a map showing 100 House districts with less population variances from the ideal than are involved in the Board's plan. In point of fact, Mr. Bass never prepared an overall plan for the House. He did prepare a series of maps breaking down all of the multi-member districts except District 84 into single member districts. At the commencement of the argument we permitted those maps to be introduced in evidence, and they have been considered. However, Mr. Bass did not testify about those maps and so was not subject to crossexamination with respect to them.

The Board's variations in the populations of House districts have given us concern, but we have not been persuaded that in the overall circumstances of the case they are so great as to render the plan for the House unconstitutional. The variations involved here are less than those challenged unsuccessfully in local legislative context in Abate v. Mundt, supra. And they are certainly less than those present in the apportionment plan which was approved for the Arkansas House in 1965. Yancey v. Faubus, supra, 251 F.Supp. at 1003.

The overpopulation of District 70 could be reduced without difficulty by detaching Barren Township with a population of 574 from District 70 and adding it to District 48 which consists of Woodruff County and the southern part of Independence County. Such a move would reduce the population of District 70 from 20,452 to 19,878 and would increase the population of District 48 from 18,902 to 19,476. The net result would be that instead of having one

"overpopulated" and one "underpopulated" district located side by side, we would have two "overpopulated" districts. If one takes a practical view of apportionment rather than a purely mathematical one, the "gain" incident to revising Districts 70 and 48 would hardly be worth the inconvenience and political disruption that the revision would entail. What we have said heretofore about increasing the size of Garland County Senate District at the expense of a neighboring county would appear to be applicable to the House District 70 situation.

Similarly, revising district lines to increase the populations of some of the small districts would hardly produce constitutional advantages to the people involved comparable to the practical disadvantages that the revisions would entail.

█ It should be said again that the question before us is not whether the Board could have done a better job of apportionment than it did but whether it did a constitutional job. And we hold that the plan for the House should not be stricken down on the basis of population variances among districts.

There remains for consideration the controversy about whether the House plan is unconstitutional by reason of the multi-member districts created by the Board.

█ We do not consider constitutionally substantial the claim that multi-member legislative districts discriminate unconstitutionally against non-affluent candidates or prospective candidates for legislative office. As long as our political and economic system remains as it is those who are well funded have certain advantages over those who are not. But, the Fourteenth Amendment has not yet been construed as requiring financial or economic equality among candidates for public office, and we are not prepared to so construe it. Nor do we see that a candidate for a State legislature who runs for office in a multi-member district in a county is entitled to any more protection from the standpoint of financial competition than a candidate for sheriff who is required to run at large in the county as a whole. Neither are we by any means satisfied that the evidence shows that a non-affluent candidate for the Legislature is necessarily worse off in a multi-member district than he would be in a single member district. Running for office successfully involves many things other than money, and in Arkansas, as elsewhere, the race does not always go to the financially strong.

By way of introduction to a discussion of the claim that multi-member districts in Arkansas discriminate against blacks and Republicans in Arkansas it is well to advert to Whitcomb v. Chavis, supra. In that case the Court said (403 U.S. at 142–144, 91 S.Ct. at 1868):

"The question of the constitutional validity of multi-member districts has been pressed in this Court since the first of the modern reapportionment cases. These questions have focused not on population-based apportionment but on the quality of representation afforded by the multi-member district as compared with single-member districts. In Lucas v. Colorado [Forty-Fourth] General Assembly, 377 U.S. [713, 84 S.Ct. 1459, 12 L.Ed.2d 632] (1964), decided with Reynolds v. Sims, we noted certain undesirable features of the multi-member district but expressly withheld any intimation 'that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective.' 377 U.S., at 731, n. 21 [84 S.Ct., at 1471]. Subsequently, when the validity of the multi-member district, as such, was squarely presented, we held that such a district is not per se illegal under the Equal Protection Clause. Fortson v. Dorsey, 379 U.S. 433 [85 S.Ct. 498, 13 L.Ed.2d 401]. (1965); Burns v. Richardson, 384 U.S. 73 [86 S.Ct. 1286, 16 L.Ed.2d 376] (1966); Kilgarlin v. Hill, 386 U.S. 120 [87 S.Ct. 820, 17 L.Ed.2d 771] (1967). See also Burnette

v. Davis, 382 U.S. 42 [86 S.Ct. 181, 15 L.Ed.2d 35] (1965); Harrison v. Schaefer, 383 U.S. 269 [86 S.Ct. 929, 15 L.Ed.2d 750] (1966). That voters in multi-member districts vote for and are represented by more legislators than voters in single-member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district systems justiciable, recognizing also that they may be subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' *Fortson,* 379 U.S., at 439 [85 S.Ct. at 501], and *Burns,* 384 U.S., at 88 [86 S.Ct., at 1294]. Such a tendency, we have said, is enhanced when the district is large and elects a substantial proportion of the seats in either house of a bicameral legislature, if it is multi-membered for both houses of the legislature or if it lacks provision for at-large candidates running from particular geographical subdistricts, as in *Fortson. Burns,* 384 U.S., at 88 [86 S.Ct., at 1294]. But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements. We have not yet sustained such an attack."

The Court then discussed and rejected contentions that voters in multi-member districts have more "power" than voters in single member districts, and that multi-member districts discriminate against single member districts in that representatives from multi-member districts engage in "bloc voting." Proceeding, the Court dealt with the contention that multi-member districts discriminate against minority groups residing in so-called "ghetto areas" and having or supposedly having substantive interests differing from those of the dominant majority residing in the overall district. That claim assumes, of course, that a "ghetto area" is large enough from the standpoint of population and cohesive enough from the standpoint of geography to enable its inhabitants or a majority of them to elect a representative were their area a single member district. That claim would also appear to assume that the majority of voters in the overall multi-member district will usually, if not invariably, vote for non-ghetto candidates regardless of the qualifications of ghetto candidates, just as the claim of the Sevier County intervenors in this case assumes that Howard County voters will always vote for Howard County candidates regardless of the merits of Sevier County candidates.

The holding of the Supreme Court was that where minority groups are permitted to participate freely in the overall political process, they do not suffer unconstitutional discrimination simply because they may not be able to elect members of their own groups to the Legislature as they would be able to do if they were voting in a single member district or in single member districts. To put it another way, the Court held that the Constitution does not assure minorities, whether racial or political, proportional representation or "safe seats" in the Legislature. 403 U.S. at 148–160, 91 S.Ct. 1858, 29 L.Ed.2d 363.

In applying those principles to this case it may be conceded to petitioners that the Board could have drawn district lines more favorable to Republicans and blacks than those that were in fact drawn. In other words, districts, whether single member or multi-member, could have been established which would have assured safe seats for blacks and perhaps for Republicans. But, under *Chavis* the Board was not required to take such an approach. Actually, the district lines in Pulaski County were so drawn as apparently to insure that blacks can elect at least three members of the House and at least one Senator; and we are not convinced on this record that in other sections of the State lines were drawn so as to disturb unreasonably or substantially any existing Republican strength.

584

Although the Republican Party is in a very distinct minority in Arkansas, it can hardly be contended seriously that Republicans are denied access to Arkansas political processes, that they do not vote, and that they do not at times elect Republicans to office, including legislative office. As has been said, at the present time the Arkansas Senate includes one Republican, and the House includes two, one of whom is a plaintiff in this case, and one of Arkansas' four representatives in Congress is a Republican. Additionally, there are some county officers in the State who are Republicans.

There is no convincing evidence here that the Republican inability to elect more than a very few members of the Legislature, an inability that may or may not continue to exist with the passage of time, has been due to the fact that Republicans have been required or will be required to run in multi-member rather than single member districts. The present Republican member of the House who is a plaintiff here was in fact elected from a multi-member district. The difficulty faced by the Republican Party in Arkansas lies not in the structuring of legislative districts, it is simply that the Republican Party in this State is not, at least as yet, sufficiently strong at the grass roots level to elect substantial numbers of candidates to the Legislature under any apportionment plan.

Whether the Republican Party is gaining strength in Arkansas or not, there is no question that the influence of Negroes in Arkansas political affairs, and the participation of Negroes in those affairs, have increased steadily in recent years and are continuing to increase. No serious candidate for State office in Arkansas today can ignore the Negro vote. And no serious candidate for a district or local office in an area containing a Negro majority or a substantial Negro minority can afford to ignore the vote of blacks or the legitimate interests of black constituents.

Apart from certain requirements as to residence, the validity of which is not involved in this particular case, all that a citizen of Arkansas has to do in order to become eligible to vote is to register, and the registration process is simplicity itself. Once he registers, it is up to him whether he votes or runs for office, and if he votes, he is free to vote for the candidate of his choice.

It is true that no Negroes have been elected to the Arkansas Legislature since Reconstruction, but we are not persuaded that that fact has been due to the structuring of legislative districts or that in the future Negroes will suffer as a result of multi-member legislative districts, except in the sense that, as pointed out, the Board could have assured blacks "safe seats," which the Board was not constitutionally required to do.

It is clear that the multi-member districts in Northwest Arkansas, the multi-member district that includes Jonesboro, and the multi-member district that incorporates the City of Hot Springs, do not discriminate against Negroes for the simple reason that there are not enough blacks in those districts to profit from the establishment of single member districts.

District 84 is a more troublesome one. That district consists of five Crittenden County Townships and two townships taken out of the eastern part of St. Francis County. The total population of the district, which has been assigned two members, is 38,220 of which 16,589 or 43.5 percent are black. The district includes the City of West Memphis which has about 25,000 people. West Memphis is located in Mississippi Township which has a population of 26,985 of which 33.4 percent are black. The record does not reflect where the black population of Mississippi Township is concentrated, if in fact it is. From the evidence we find that cut lines could be drawn so that a single member district would be created consisting of three Census Tracts in West Memphis and having a population of 18,806 and so that another single member district would be created consisting of the remaining two Census Tracts in the City

plus the other townships in District 84 which would have a population of 19,414. Had the Board taken that course, it would in all probability have assured Negroes a "safe seat" in that area, whereas they may not be able to elect a Negro from District 84 as created by the Board. However, as we have said repeatedly, the Board was not required to give the Negroes such a "safe seat." Moreover, the two Census Tracts that would have to come out of West Memphis in the course of splitting District 84 contain 6,668 people, and we do not know how many of them are Negroes. If those tracts are in fact heavily populated with blacks, their severance might have the effect of completely submerging the minority of Negroes who would be left in what would be primarily a "city district" consisting of most of West Memphis. We are not persuaded that District 84 was created for the purpose of discriminating against blacks in the Crittenden County-West Memphis area or that the substantial minority of blacks in that District have been subjected to unconstitutional discrimination.

Turning now to the multi-member districts in Pulaski County where the main attack on such districts is focused, we find that in that county there are only two political townships. Hill Township is all of Pulaski County lying North of the Arkansas River, and Big Rock Township is all of Pulaski County lying South of the River. The City of Little Rock is located in Big Rock Township. Hill Township contains the Cities of North Little Rock, Jacksonville, and Sherwood. Both townships contain substantial rural areas.

We have seen that the Board created five multi-member districts for Pulaski County with each district electing three members. District No. 1 consists principally of all of Hill Township, except the City of North Little Rock; it does include, however, Enumeration District 45 which is within the corporate limits of North Little Rock and four Enumeration Districts carved out of Big Rock Township. District No. 2 is the City of North Little Rock, less Enumeration District 45. District No. 3 consists of the eastern part of the City of Little Rock plus a substantial rural area in the Southeast part of the County. District No. 4 is located immediately West of District No. 3; it is located entirely within the City of Little Rock and is described as "Little Rock Central." District No. 5 consists of Western Little Rock and all of the rural area of Big Rock Township not included in District No. 1. The racial consists of the five districts are shown on the following table.

Table 2: Racial Consists of Pulaski County House Districts

| Dist. No. | Population | Black | Non-Black | % Black |
|---|---|---|---|---|
| 1 | 56,564 | 7,525 | 49,039 | 13 |
| 2 | 58,197 | 9,641 | 48,556 | 16.5 |
| 3 | 57,412 | 33,600 | 23,812 | 58.5 |
| 4 | 57,318 | 5,952 | 51,366 | 10 |
| 5 | 57,698 | 2,545 | 55,153 | 4 |

We find that the Board's Pulaski County districts South of the River are laid out rationally in relation to the geography of the County, including roads, streets, and streams. There are simply very few Negroes in the western part of the City of Little Rock and in the western and southwestern parts of Big Rock Township outside Little Rock. The concentration of blacks in Pulaski County South of the River is in the eastern part of the City of Little Rock which is included in District No. 3, and as far as mere numbers are concerned, blacks heavily outnumber whites in that District, and if they want to, they should be able to elect all three members of the House from that District. There is also a close correspondence between the area included in House District No. 3 and Senate District No. 3, and the latter District has a population that is 61 percent black.

Looking North across the River we think that the Board acted rationally in incorporating the City of North Little Rock (minus E.D. 45) into a single district and putting the rest of Hill Township, plus E.D. 45, into another district. E.D. 45, we might say, is the northern

part of the Levy section of North Little Rock; it is bounded in part by the city limits and lies immediately South of Camp Joseph T. Robinson which is now a training area used by the Arkansas National Guard.

We have examined Mr. Bass's single member district map for Pulaski County, and we do not see that his proposed apportionment would do the blacks as blacks any particular good. It might give them one representative in the eastern part of North Little Rock, but it is conceivable that it could cost them one South of the River. We are not sure. In any event, the Board was not required constitutionally to carve out a "safe" black district North of the River or anywhere else.

In Pulaski County as a whole blacks make up a little over 20 percent of the total population of the County. If they can elect three members of the House and one member of the Senate, they will have almost exactly proportional representation in the County's delegation to the Legislature, which is something to which actually they are not constitutionally entitled. And that may well explain the fact that organized groups in Pulaski County interested in Negro rights and the welfare of Negroes did not intervene in the case.

We have given careful consideration to the single member districts in the counties having large Negro populations. In some of those counties blacks are in the majority; in others they make up more or less large minorities. We do not find that in drawing single district lines the Board made any effort to submerge Negro minorities or to dilute the voting strength of Negroes. On the other hand, some single member districts were created in which blacks are in an absolute majority. At the very least, Negroes ought to be able to elect a Representative from District 79 which consists of all of Chicot and a small part of Ashley County; they ought to be able to elect two from Phillips County which is divided between District 76 and District 77, and they are in a majority in District 75 which consists of Lee County as a unit.

In conclusion, let it be said that no one can know definitely how blacks will fare under the Board's apportionment because no election has yet been held under it. A great deal will depend on the interest that blacks may take in electing black candidates to the Legislature. If black voters want to be represented by black Senators and Representatives, and if suitable black candidates are forthcoming, and if they will run on sound platforms, and if the black voters will go to the polls and vote for those candidates, they should do very well indeed in quite a number of areas in the State where there are large concentrations of Negroes.