Senator Kenneth ARMBRISTER,
et al.,[1] Appellants,

v.

Dan MORALES, in His Official Capacity as Attorney General, et al.,[2] Appellees.

No. 03–97–00011–CV.

Court of Appeals of Texas,
Austin.

April 10, 1997.

---

1. The other appellants are Senators Gonzalo Barrientos, Teel Bivins, J.E. "Buster" Brown, David Cain, John Carona, Rodney Ellis, Mario Gallegos, Michael Galloway, Chris Harris, Tom Haywood, Eddie Lucio, Gregory Luna, Frank Madla, Mike Moncrief, Jane Nelson, Drew Nixon, Jerry Patterson, Bill Ratliff, Florence Shapiro, David Sibley, Carlos Truan, Jim Turner, Jeff Wentworth, Royce West, John Whitmire, and Judith Zaffirini.

2. The other appellees are George W. Bush, in his official capacity as Governor, Tony Garza, in his official capacity as Secretary of State, Bob Bullock, in his official capacity as Lieutenant Governor, and James E. "Pete" Laney, in his official capacity as Speaker of the House of Representatives.

Richard E. Gray, III, Gray & Becker, P.C., Austin, for appellants.

Dan Morales, Attorney General, Javier Aguilar, Special Assistant Attorney General, Austin, for appellees.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

CARROLL, Chief Justice.

■ This case arises out of a dispute over the effect of a settlement in a federal lawsuit involving the reapportionment [3] of Texas senators to new districts. Appellants, all of whom are current state senators ("senators"), sued several state officials ("officials") on July 24, 1996, in state district court, seeking a declaration that legislative adoption of the settlement would not trigger the need for the election of an entirely new Senate. *See* Tex. Const. art. III, § 3. The district court disagreed and ruled on January 2, 1997, that adoption of the settlement would trigger the need for the election of a new Senate.

The senators appealed. The appellate record was not complete until February 12, 1997. The parties continued to file reply letters and briefs until February 26, 1997. Both the senators and officials requested oral argument, which we set at the earliest possible date, April 16, 1997. Thereafter the parties chose to waive oral argument; consequently, we can now decide the cause without waiting for the oral presentations. Because we disagree with the trial court's interpretation of the constitutional provision at issue, we will reverse the trial court's judgment and

---

**3.** The word "apportionment" is closely connected to the concept of legislative "districting." "Apportionment," in the technical sense, refers solely to the process of allocating legislators among several areas, while "districting" entails the actual drafting of district lines. *Kilgarlin v. Martin*, 252 F.Supp. 404, 410 n. 1 (S.D.Tex. 1966), *rev'd on other grounds*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). In Texas, the legislature both "apportions" its senatorial seats and "districts" geographical areas into units. *See id.* In the interest of clarity, therefore, we will refer to the total process as "apportionment" in our opinion. *See id; see also* Op.Tex.Att'y Gen. Nos. M–389 (1969), DM–351 (1995).

render judgment in favor of the appellant senators.

## THE CONTROVERSY

This lawsuit was tried upon stipulated facts and presents a pure question of law. The dispute requires us to interpret the meaning of the word "apportionment" as used in article III, section 3 of the Texas Constitution. Section 3 reads in relevant part as follows:

The Senators shall be chosen by the qualified electors for the term of four years; *but a new Senate shall be chosen after every apportionment, and the Senators elected after each apportionment shall be divided by lot into two classes.* The seats of the Senators of the first class shall be vacated at the expiration of the first two years, and those of the second class at the expiration of four years, so that one half of the Senators shall be chosen biennially thereafter. . . .

Tex. Const. art. III, § 3 (emphasis added). This provision sets up the "staggered term" senatorial election system used in this state.

Our discussion of this case requires us to detail the events leading up to the present dispute. The Texas Constitution requires the legislature to apportion the state into senatorial and representative districts every decade after the publication of the United States census. *See* Tex. Const. art. III, § 28. To satisfy this requirement, the legislature in 1991 enacted bills reapportioning both the House and Senate districts. *See* Act of May 24, 1991, 72d Leg., ch. 892, 1991 Tex.Gen. Laws 3016 ("1991 enactment").

After the 1991 enactment, two unrelated groups of plaintiffs sued the state in both state and federal district court alleging that the 1991 enactment constituted racial gerrymandering. The state district court ordered a new apportionment plan, which the Texas Supreme Court declared void in *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991). As a result of the supreme court's decision, no reapportionment plan was in effect for use in the 1992 elections. The legislature attempted to remedy the situation by convening in special session and enacting the state district court's proposed plan. *See* Act of Jan. 8,

1992, 72d Leg., 3d C.S., ch. 1, 1992 Tex.Gen. Laws 1 ("1992 enactment"). The federal court, however, refused to allow the 1992 legislative enactment to be used in the 1992 election. *See Terrazas v. Slagle,* 821 F.Supp. 1154 (W.D.Texas 1992). Instead, the federal court created its own plan for use in the 1992 election.

Because the federal court's plan was the first apportionment since the 1990 census, all Senate seats were up for re-election in 1992. In 1993, all newly elected senators drew lots to determine whether they had won two- or four-year terms.

In 1993, the federal district court approved the use of the 1992 enactment for the 1994 election. *See Terrazas v. Slagle,* 821 F.Supp. 1162 (W.D.Tex.1993). Because the 1992 enactment differed from the court-ordered plan used in the 1992 election, all Senate seats were up for re-election in 1994, and in 1995, all newly elected senators again drew lots to determine whether they had won two- or four-year terms.

Soon after these original lawsuits were put to rest, a new group of plaintiffs filed another lawsuit, this time alleging the 1992 legislative enactment constituted racial gerrymandering. The parties to the new lawsuit, styled *Thomas v. Bush,* reached a settlement agreement that imposed changes to senatorial districts only in the Dallas and Houston areas (the *"Thomas* plan"). The federal court rendered a temporary order requiring the new Dallas and Houston districts be used in the 1996 election. The court also found in its order that Texas law did not require the election of a new Senate and a new drawing of lots as a result of imposition of the order. Consequently, only one-half of the Senate seats were up for re-election in 1996.

The parties to the *Thomas* lawsuit have agreed that the lawsuit will be dismissed if the legislature enacts the *Thomas* plan. Before the legislature attempted to enact the *Thomas* plan, however, the senators sued the officials in state district court seeking a declaration that the enactment of the *Thomas* plan will not require the election of a new Senate in 1998. The trial court ruled that enactment of the plan will require all sena-

tors to run for re-election in 1998. We must decide, therefore, whether the enactment of the *Thomas* plan constitutes an "apportionment" as that word is used in article III, section 3 of the Texas Constitution.

## DISCUSSION

■ No Texas court has construed the relevant provision of section 3. This is, therefore, a case of first impression. Because this case involves a pure question of law, we review the trial court's determination of the issue de novo. *Barber v. Colorado Indep. Sch. Dist.,* 901 S.W.2d 447, 450 (Tex. 1995). After considering the language of article III, section 3 and the arguments of both sides, we conclude the enactment of the *Thomas* plan will not constitute a section 3 apportionment.

■ We first seek to define the word "apportionment." In interpreting the constitution, we give words their natural, obvious, and ordinary meanings as they are understood by the citizens who adopted them. *See Winger v. Pianka,* 831 S.W.2d 853, 856 (Tex. App.—Austin 1992, writ denied) (citing *State v. Clements,* 319 S.W.2d 450, 452 (Tex.Civ. App.—Texarkana 1958, no writ)). According to Webster's Third New International Dictionary, to "apportion" is to "divide and assign in proportion" or to "allot." *See Webster's Third New International Dictionary* 105 (Philip E. Gove, ed. 1986). According to Black's Law Dictionary, an "apportionment" is "the process by which legislative seats are distributed among units entitled to representation." *Black's Law Dictionary* 99 (6th ed. 1990).

The officials argue enactment of the *Thomas* plan will constitute an apportionment because it will effectively distribute or divide the senatorial seats among the new senatorial districts. We disagree because the senatorial seats have already been divided among the new districts. The *Thomas* court ordered that the settlement plan be used in the 1996 election; the plan was so used. The *enactment* of the *Thomas* plan will do nothing more than memorialize the apportionment already applied in the previous election. Because the proposed legislative action does not change the division of senatorial seats currently in effect, it does not constitute "distribution" or "division" of seats. Hence, it does not qualify as an apportionment within the meaning of section 3.

Both parties argue our decision should be influenced by policy concerns. Neither our conclusion nor the district court's judgment effects the main policy underlying the constitutional provision. That is, the provision seeks to ensure that voters in any changed district will not be represented for more than two years by a senator they did not elect.[4] Only half of the Senate seats were elected in 1996.[5] Nothing in the record indicates that any or all the seats from the districts changed by the *Thomas* plan were up for re-election in 1996. Consequently, some of the constituents in the half of the districts *not* elected in 1996 may currently be represented, after implementation of the *Thomas* plan, by a senator they did not elect. By 1998, those constituents will have waited four years before having a chance to vote for their own senator. The election of an entirely new Senate in 1998 will not shorten this period. The only action that would have prevented contravention of this constitutional policy is the election of an entirely new Senate *in 1996,* an action that cannot happen now. Whether half or all senatorial seats are up for re-election in 1998, all constituents will be represented, after the 1998 election, by a senator for whom they had an opportunity to vote. In other words, the issue of whether a court can give effect to the primary policy underlying section 3 in the context of this dispute is moot.

Furthermore, our holding, unlike the district court's ruling, serves other general policies underlying section 3. First, the

4. The staggered-term electoral system requires an election to be held every two years. Article III, section 3 dictates that a new Senate (i.e., *all* Senate seats, as opposed to half) be elected after every apportionment. The longest a voter in a reapportioned district would have to wait to vote in the changed district, therefore, would be two years.

5. Specifically, the half up for re-election in 1996 was comprised of those seats assigned two-year terms in 1995, after the 1994 election.

staggered-term senatorial electoral system ensures that the Senate always has the service of experienced members. *See* Tex. Const. art. III, § 3, Interpretive Commentary. Second, allowing senators to have four-year terms, as opposed to the two-year terms of members of the House of Representatives, conceivably makes the Senate less subject to the demands of popular opinion than the house. *See id.* The district court's ruling would require that an entirely new Senate be elected yet a third time this decade. This ruling unnecessarily frustrates the policies underlying section 3.

We wish to make clear that our decision is narrow and limited to the facts presented here. We do not mean to suggest that section 3 requires only a single "new Senate" election every decade, as the senators argue. Moreover, this case does not require us to decide whether enactment of a court-ordered plan would trigger election of an entirely new Senate had the court-ordered plan not been used in an election in the interim. Neither does the case require us to decide whether the *Thomas* plan constituted an apportionment under section 3. Today's holding turns on the fact that the court-ordered *Thomas* plan was given effect in the 1996 election. Having said that, we sustain the senators' point of error.

### CONCLUSION

We reverse the judgment of the trial court and render judgment in favor of the senators. If the legislature enacts the *Thomas* plan, Texas Constitution article III, section 3 will not necessitate the election of a new Senate in 1998 or a re-drawing of lots afterward.

Reversed and Rendered.