# ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

September 23, 2003

The Honorable Frank J. Corte, Jr.
Chair, Committee on Defense Affairs
    & State-Federal Relations
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. GA-0103

Re: Whether the legislature may authorize the state to operate video lottery terminals (RQ-0039-GA)

Dear Representative Corte:

You ask whether the legislature may authorize the state to operate video lottery terminals in the absence of a constitutional amendment permitting their operation.

## I.    Background

Article III, section 47 of the Texas Constitution requires the legislature to "pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d), and (e) of this section." TEX. CONST. art. III, § 47(a). Subsection (b) permits the legislature to "authorize and regulate bingo games" conducted by religious, fraternal and other nonprofit organizations. *Id.* § 47(b). Subsection (d) declares that the legislature "may permit charitable raffles conducted by a qualified religious society, qualified volunteer fire department, qualified volunteer emergency medical service, or qualified nonprofit organizations." *Id.* § 47(d). Subsection (e) states that "[t]he Legislature by general law may authorize the State to operate lotteries and may authorize the State to enter into a contract with one or more legal entities that will operate lotteries on behalf of the State." *Id.* § 47(e).

Pursuant to the constitutional directive to "pass laws prohibiting lotteries," except as specifically authorized by other provisions of article III, section 47, the legislature has adopted numerous penal statutes that prohibit various aspects of gambling. *See generally* TEX. PEN. CODE ANN. ch. 47 (Vernon 2003). Specifically, section 47.06(a) provides that "[a] person commits an offense if, with the intent to further gambling, he knowingly owns, manufactures, transfers, or possesses any gambling device that he knows is designed for gambling purposes or any equipment that he knows is designed as a subassembly or essential part of a gambling device." *Id.* § 47.06(a). "Gambling device" is defined as:

> any electronic, electromechanical, or mechanical contrivance not
> excluded under Paragraph (B) that for a consideration affords the

player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance. The term:

(A) includes, but is not limited to, gambling device versions of bingo, keno, blackjack, lottery, roulette, video poker, or similar electronic, electromechanical, or mechanical games, or facsimiles thereof, that operate by chance or partially so, that as a result of the play or operation of the game award credits or free games, and that record the number of free games or credits so awarded and the cancellation or removal of the free games or credits . . . .

*Id.* § 47.01(4).

You state that "[c]urrent legislation in the House and Senate, in essence, repeals this prohibition, and either uses this definition or a very similar definition to authorize VLT's [video lottery terminals]."[1] In addition, the Comptroller of Public Accounts has recently "issued an e-Texas recommendation . . . calling for Texas to implement a video lottery system." Request Letter, *supra* note 1, at 1. The Comptroller's proposal states, in relevant part:

Video lottery terminals (VLTs) are centrally monitored game machines that can offer a variety of games of chance. VLTs typically pay out a much larger percentage of the "take" in the form of prizes – about 90 percent – than other forms of lottery games. State lottery agencies control these machines via a central computer system, just as the Texas Lottery Commission does with its lotto terminals.

CAROLE KEETON STRAYHORN, TEXAS COMPTROLLER OF PUBLIC ACCOUNTS, SPECIAL REPORT TO THE LEGISLATURE, ADDITIONAL e-TEXAS RECOMMENDATIONS, ED 18 (2003), *available at* http://www.cpa.state.tx.us/specialrpt/etxaddnl/ed18.html. You ask "whether the Texas Legislature may authorize the operation of video lottery terminals without an amendment to the Texas Constitution." Request Letter, *supra* note 1, at 2. Given your reference to the Comptroller's proposal, it appears that your request is limited to the legislature's authority to permit the state to operate video lottery terminals under article III, section 47(e) of the Texas Constitution.

## II.    The Issue

As we have noted, article III, section 47(a) of the Texas Constitution requires the legislature to "pass laws prohibiting lotteries and gift enterprises." TEX. CONST. art. III, § 47(a). As we will

---

[1]Letter from Honorable Frank J. Corte, Jr., Chair, House Committee on Defense Affairs & State-Federal Relations, to Honorable Greg Abbott, Texas Attorney General at 1 (Apr. 14, 2003) (on file with Opinion Committee) [hereinafter Request Letter].

demonstrate, *infra*, this constitutional prohibition has existed for more than a century. In 1991, Texas voters added an exception to article III, section 47, that permits the legislature to "authorize the State to operate lotteries." *Id.* § 47(e). The fundamental issue before us is what the voters intended in adopting that 1991 amendment.

## III.   Analysis

### A.   Meaning of "Lottery" under Article III, Section 47(a)

Texas courts have consistently held that the term "lottery" includes a wide range of activities involving the distribution of something of value by chance in exchange for valuable consideration. This construction of the term "lottery" predates our current constitution. The constitution of 1845 and every subsequent constitution have included a prohibition against lotteries. The constitutions of 1845, 1861, 1866, and 1869 stated that "[n]o lottery shall be authorized by this State; and the buying [or/and] selling of lottery tickets within this State is prohibited." TEX. CONST. of 1869, art. XII, § 36; TEX. CONST. of 1866, art. VII, § 17; TEX. CONST. of 1861, art. VII, § 17; TEX. CONST. of 1845, art. VII, § 17. The constitutional convention of 1875 expanded this language in response to activities authorized by the 1873 legislature to state that "[t]he Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions of the lottery principle, established or existing in other States." TEX. CONST. of 1876, art. III, § 47(a). But even prior to the 1876 constitution, the Texas Supreme Court had found

> [that] it makes not the slightest difference whether it be styled a "Gift Enterprise," "Book Sale," "Land Distribution, or "Art Association," each and all are lotteries when the element of chance is connected with, or enters into the distribution of its prizes. . . . "Courts will inquire *not* into the name, but the game, to determine whether it is a prohibited game."

*Randle v. State*, 42 Tex. 580 (Tex. 1874).

As early as 1899, the Court of Criminal Appeals held that operation of a "slot machine," as described therein, constituted a "lottery." *Prendergast v. State*, 57 S.W. 850, 851 (Tex. Crim. App. 1899). Then, in 1936, the Texas Supreme Court considered whether a "bank night" held at a local theater was a "lottery" under the constitution. *City of Wink v. Griffith Amusement Co.*, 100 S.W.2d 695 (Tex. 1936). The court articulated the three elements necessary to constitute a lottery: (1) the offering of a prize, (2) by chance, and (3) the giving of consideration for an opportunity to win the prize. Of the three, the court declared that "chance" is the element that constitutes the very basis of a lottery, and without which a game would not be a lottery. *Id.* at 701. For our purposes, it is sufficient that the Supreme Court had by 1936 laid out the definitive elements that constitute a "lottery" in the State of Texas: prize, chance, and consideration.

In 1971, the legislature amended article 654 of the Penal Code, the criminal statute that at that time implemented article III, section 47, to permit certain "charitable organizations to conduct lotteries for their benefit on property owned by the conducting agency" and allowing the "sale or drawing of a prize at a fair held in this State for the benefit of a church, religious society, veteran's organization," or similar entity. Act of May 30, 1971, 62d Leg., R.S., ch. 922, 1971 Tex. Gen. Laws 2823. As enacted, the amendment was intended to permit activities held under the aegis of a particular class of charitable or quasi-charitable institution, such as churches and veterans' organizations, that were otherwise proscribed by the Penal Code. In *Tussey v. State*, 494 S.W.2d 866 (Tex. Crim. App. 1973), the court held that the language of article III, section 47, prohibited the legislature from granting this exemption. The court found that "any effort by the Legislature to authorize, license or legalize lotteries is unconstitutional in light of the constitutional provision in question. . . . Further, the Legislature is likewise prohibited from indirectly doing so by way of exemption from criminal prosecution." *Id.* at 869. It is thus clear that, for purposes of subsection (a) of article III, section 47 of the Texas Constitution, the term "lottery" will be broadly construed by the courts, and that any game newly sanctioned by the legislature must be carefully scrutinized to determine whether it is a "lottery." If it is, it cannot lawfully be operated without a constitutional amendment.

## B.    Meaning of "Lottery" under Article III, Section 47(e)

Subsequent to the court's decision in *Tussey*, the legislature proposed, and the electorate approved, a series of amendments to article III, section 47. A 1980 amendment – the present subsections (b) and (c) of article III, section 47 – excepted "bingo games conducted by a church, synagogue, religious society, volunteer fire department, nonprofit veterans organization, fraternal organization, or nonprofit organization supporting medical research or treatment programs." TEX. CONST. art. III, § 47(b)-(c) (*added by* Tex. S.J. Res. 18, 66th Leg., R.S. (1979)). Subsection (d) was added in 1989 to permit "charitable raffles" held by those entities that were already authorized to conduct bingo games. TEX. CONST. art. III, § 47(d) (*added by* Tex. H.R.J. Res. 32, 71st Leg., R.S. (1989)). The most recent amendment, subsection (e), permits the legislature to "authorize the State to operate lotteries and [to] authorize the State to enter into a contract with one or more legal entities that will operate lotteries on behalf of the State." TEX. CONST. art. III, § 47(e) (*added by* Tex. H.R.J. Res. 8, 72d Leg., 1st C.S. (1991)). Each of these amendments is an exception to the historical prohibition against "lotteries" set forth in subsection (a).

Courts "rely heavily on the literal text" of a constitutional amendment and will "give effect to its plain language." *Doody v. Ameriquest Mortgage Co.*, 49 S.W.3d 342, 344 (Tex. 2001). Article III, section 47(a) requires the legislature to "pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d), and (e) of this section." TEX. CONST. art. III, § 47(a). Subsection (e) declares that the legislature may "authorize the State to operate lotteries and may authorize the State to enter into a contract with one or more legal entities that will operate lotteries on behalf of the State." *Id.* § 47(e). If the term "lotteries" as used in subsection (e) has the same meaning as the use of the term in subsection (a), *i.e.*, the expansive meaning promulgated by Texas courts from 1874 to 1973, then the legislature may, under the former provision, authorize the state to operate *any* game included within the ambit of subsection (a), *i.e.*, any "game of chance."

Under that construction, the legislature could permit the state, or an entity with which it contracts, to establish casino gambling within the State of Texas. But the two sections are not identical. Subsection (a) broadly requires the prohibition of "lotteries and gift enterprises" whereas subsection (e) permits the legislature to authorize the state to operate lotteries. The language of subsections (a) and (e) is sufficiently different that it is not plain from the face of section 47 whether subsection (e) permits everything that subsection (a) prohibits.

In addition to considering constitutional provisions' plain language, courts also construe the words of an amendment "as they are generally understood." *Spradlin v. Jim Walters Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). The fundamental rule that courts follow when interpreting a constitutional amendment is to give effect to the intent of the legislators who proposed it and the people who adopted it. *See Gragg v. Cayuga Indep. Sch. Dist.*, 539 S.W.2d 861, 866 (Tex. 1976); *see also Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 355 (Tex. 2000) ("We strive to give constitutional provisions the effect their makers and adopters intended."); *City of El Paso v. El Paso Cmty. Coll. Dist.*, 729 S.W.2d 296, 298 (Tex. 1986) ("In construing a constitutional amendment, we look to the intent of the framers and the voters who adopted the amendment."). Furthermore, in determining that intent, "[c]onstitutional provisions, like statutes, are properly to be interpreted in the light of conditions existing at the time of their adoption, the general spirit of the times, and the prevailing sentiments of the people." *Mumme v. Marrs*, 40 S.W.2d 31, 35 (Tex. 1931). Moreover, "in determining the meaning, intent and purpose of a constitutional provision, the history of the time out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry." *Markowsky v. Newman*, 136 S.W.2d 808, 813 (Tex. 1940). *See also Dir. of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 267 (Tex. 1980). Finally, courts will give weight to a contemporaneous construction given by the legislative or executive branches of government. *See Walker v. Baker*, 196 S.W.2d 324, 327 (Tex. 1946).

A number of factors indicate that the voters who adopted subsection (e) did not intend to authorize the state to operate video lottery terminals.

### 1. The Common Understanding of "Lottery" in 1991

In *Armbrister v. Morales*, 943 S.W.2d 202 (Tex. App.–Austin 1997, no writ), the court considered the meaning of the term "apportionment" as used in article III, section 3 of the Texas Constitution. The court observed that, "[i]n interpreting the constitution, we give words their natural, obvious, and ordinary meanings as they are understood by the citizens who adopted them." *Id.* at 205. Then the court proceeded to define the term by reference to two dictionaries, *Webster's Third New International Dictionary* and *Black's Law Dictionary*. *Id.* Because the intent of the electorate that adopts a constitutional amendment is more likely to agree with the meaning of a term as defined in a recent dictionary than with its technical meaning as construed by courts of old, it is instructive to consider the modern common meaning of the term "lottery."

Dictionary definitions of the term "lottery" indicate that the "natural, obvious, and ordinary," *see id.*, meaning of the term, as understood by the voters who adopted subsection (e), does not accord

with the broadly expansive legal meaning of the term as used in subsection (a) and construed by Texas courts from the late nineteenth century through the *Tussey* case in 1973. *Webster's Third New International Dictionary* defines "lottery" as "[a] scheme for the distribution of prizes by lot or chance; esp., a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them, usually as determined by the numbers on tickets as drawn at random from a lottery wheel." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1338 (1969). Other recent popular dictionaries accord with this definition. *See, e.g.,* AMERICAN HERITAGE DICTIONARY 1034 (4th ed. 2000) ("lottery" is "[a] contest in which tokens are distributed or sold, the winning token or tokens being secretly predetermined or ultimately selected in a random drawing"); NEW OXFORD AMERICAN DICTIONARY 1010 (1st ed. 2001) ("lottery" is "a means of raising money by selling numbered tickets and giving prizes to the holders of numbers drawn at random"). *Black's Law Dictionary* defines "lottery" as "a method of raising revenues, especially state-government revenues, by selling tickets and giving prizes (usu. large cash prizes) to those who hold tickets with winning numbers that are drawn at random." BLACK'S LAW DICTIONARY 959 (7th ed. 1999). These definitions reflect the common public understanding of the term "lottery" as it was considered by the voters in 1991. The expansive legal definition espoused in judicial decisions from 1874 to 1973 does not. The legal definition may encompass any kind of game of chance, including slot machines and a variety of casino games. The popular definition, on the other hand, is restricted to a narrow and particular form of state-operated game sanctioned by the legislature and the voters in 1991. The ballot proposition presented to the voters fully supports this more restrictive construction.

### 2. *The Ballot Proposition*

Although article III, section 47(e) authorizes "the State to operate lotteries," the language of the ballot proposition was worded somewhat differently. The joint resolution that placed the lottery amendment on the ballot read as follows:

> SECTION 2.    This proposed constitutional amendment shall be submitted to the voters at an election to be held on November 5, 1991. The ballot shall be printed to provide for voting for or against the proposition: "The constitutional amendment authorizing *a state lottery.*"

Tex. H.R.J. Res. 8, 72d Leg., 1st C.S. (1991) (emphasis added). The *Analysis of Proposed Constitutional Amendments* prepared in October 1991 by the Texas Legislative Council states, in relevant part: "If the constitutional amendment is approved, the legislature may, but is not required to, adopt a law authorizing *a state lottery.*" TEXAS LEGISLATIVE COUNCIL, ANALYSIS OF PROPOSED CONSTITUTIONAL AMENDMENTS, NOVEMBER 5, 1991, ELECTION (Oct. 1991) (emphasis added). The analysis continues:

> The amendment specifically provides that all or part of the operation of *the lottery* may be delegated to private firms. House Bill 54, passed by the 72nd Legislature, 1st Called Session, establishes *a lottery* to be administered by a division of the office of the

> comptroller of public accounts. Under H.B. 54, proceeds from the
> sale of *lottery tickets* will be used to pay prizes, administrative costs,
> and ticket sales agent commissions, with the balance going into the
> state's general revenue fund. H.B. 54 will take effect only if the
> constitutional amendment authorizing *a lottery* is approved.

*Id.* at 39 (emphasis added). The wording of the ballot proposition provides further evidence that the legislators who proposed subsection (e) intended to authorize only a "state lottery" and that the voters who adopted subsection (e) were approving a "state lottery" rather than the extensive variety of games of chance prohibited under subsection (a). Near-contemporaneous construction of subsection (e) by the attorney general also supports this conclusion.

### 3. *Contemporaneous Administrative Construction*

Shortly after its adoption, the Attorney General considered whether subsection (e) of article III, section 47 could be read to permit the state itself to operate slot machines, and concluded that it could not be so construed. "No evidence has been presented that any portion of the electorate believed that, in approving the amendment for a 'state lottery,' it was thereby sanctioning slot machines. And . . . a great deal of evidence suggests that the voters who adopted the lottery amendment intended thereby to authorize only the traditional form of 'state lottery.'" Tex. Att'y Gen. Op. No. DM-302 (1994) at 10. On the basis of the "plain and definite" language of the constitutional amendment, including the omission of the term "slot machines" from the amendment or the ballot proposition, as well as extrinsic evidence, the opinion concluded that "[w]e should construe the language of the exception [to article III, section 47] in light of our contemporary situation, by limiting the meaning of the term 'lottery' as approved by the voters in 1991 to its plain meaning. . . . If the proposition passed by the legislature and presented to the voters had been intended and understood to authorize state-operated casinos, it would have been a simple matter for the language to reflect that intention." *Id.* at 9. In summary, "it is self-evident that voters presumed from the ballot language that they were voting for or against the common *perception* of a 'state lottery,' as denoted by the clear language of the ballot proposition, rather than a broad spectrum of games which embody the 'lottery principle,' as articulated by *City of Wink*, *Tussey*, and numerous other judicial decisions." *Id.* at 7. Thus, the meaning of the term "lottery" in the constitutional provision adopted as subsection (e) in 1991 differs significantly from the historical meaning it has been accorded in subsection (a). *See* TEX. CONST. art. III, § 47(a), (e).

Attorney General Opinion DM-302 was issued less than three years after the adoption of the constitutional amendment authorizing a state lottery. As we recently noted in Attorney General Opinion GA-0054 (2003), "[t]he construction placed upon statutes and constitutional amendments soon after their enactment or adoption is entitled to substantial weight." Tex. Att'y Gen. Op. No. GA-0054 (2003) at 4; *see also id.* ("contemporaneous exposition of a constitutional provision is of substantial value in constitutional interpretation," *citing Am. Indem. Co. v. City of Austin*, 246 S.W. 1019, 1023 (Tex. 1922)). Because Attorney General Opinion DM-302 (1994) was issued so soon after the adoption of subsection (e) of article III, section 47, it may be accorded the status of a contemporary administrative construction.

## IV.     Summary and Conclusion

To summarize, in approving the addition of subsection (e) to article III, section 47 of the Texas Constitution, Texas voters in 1991 did not intend to authorize the state to operate, or to contract for the operation of, "lotteries" in the broad sense that it has been construed by the courts since the adoption of the 1876 constitution. "Lotteries" under subsection (a) means any game that contains the elements of prize, chance, and consideration. In 1991, voters approved a "state lottery" based on the common understanding of the term at that time, as evidenced by popular dictionaries and the ballot proposition presented to Texas voters. Moreover, Attorney General Opinion DM-302 (1994), issued less than three years after the adoption of article III, section 47(e), is a contemporaneous administrative construction of that amendment which concludes that voters in 1991 approved a narrow construction of the term "lottery" that cannot be read to authorize the state to operate slot machines. On the basis of all these factors, we conclude that article III, section 47(e) of the Texas Constitution does not permit the legislature to authorize the state to operate video lottery terminals.

## S U M M A R Y

Article III, section 47(e) of the Texas Constitution does not permit the legislature to authorize the state to operate video lottery terminals.

Yours very truly,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Rick Gilpin
Assistant Attorney General, Opinion Committee